**KENAI PENINSULA BOROUGH, a Municipal Corporation; and Donald E. Thomas, Borough Assessor, Appellants,**

v.

**COOK INLET REGION, INC.; Salamatof Native Association, Inc., Appellees.**

No. S–3117.

Supreme Court of Alaska.

March 15, 1991.

---

Gerald L. Sharp, Peggy A. Roston, Preston, Thorgrimson, Ellis & Holman, Anchorage, for appellants.

Mark Rindner, Lane, Powell & Barker, Anchorage, for appellee Cook Inlet Region, Inc.

Russell L. Winner, Bruce A. Moore, Winner & Associates, Anchorage, for appellee Salamatof Native Ass'n, Inc.

Marjorie L. Odland, Gary I. Amendola, Asst. Attys. Gen., Juneau, Douglas B. Baily, Atty. Gen., Juneau, for amicus curiae, State of Alaska.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Chief Justice.

The Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. §§ 1601–1628 (1982), extinguished all claims of the Native people of Alaska based on aboriginal title in exchange for 962.5 million dollars and 44 million acres of public land. *See United States v. Atlantic Richfield Co.,* 612 F.2d 1132, 1134 (9th Cir.1980). The act authorized the creation of 13 regional and over 200 village corporations to receive this money and land.

In enacting ANCSA, Congress declared as a policy that "the settlement should be accomplished ... without adding to the categories of properties and institutions enjoying special tax privileges...." 43 U.S.C. § 1601(b). Congress did, however, provide for an exemption from real property taxation for lands conveyed under the act. The exemption was limited in time to 20 years, and in content to lands "which are not developed or leased to third parties." 43 U.S.C. § 1620(d)(1). This case concerns the

meaning of the term "developed" in the act.

## PROCEDURAL HISTORY

### A. *Salamatof Native Association, Inc.*

Salamatof Native Association, Inc. (Salamatof) is a village corporation which received land under ANCSA. At issue in this appeal are the tax years 1981 through 1985 and 161 tax parcels. Salamatof paid real property taxes to the Kenai Peninsula Borough (borough) on all parcels and appealed to the borough assessor. The assessor found that taxes for 1981 through 1983 were not protested in a timely manner and denied the appeal as to all parcels for those years. He found that taxes for 1984 and subsequent years were protested on time. On the merits, the assessor found that a number of parcels were exempt. However, he denied exemptions to some of the parcels presently before us on the grounds that the parcels were developed. As to these, the assessor stated, in relevant part:

a. That these parcels are within a platted subdivision and are capable of use for gainful and productive purposes as they are now, they are presently offered for sale; and

b. These parcels were created by subdivision plat. A subdivision plat is more than just mere surveying, and creates new legally defined parcels and rights regarding sale of the resulting parcels. A subdivision constitutes a purposeful modification of the land from its original state and in this case, makes it capable of a present productive gainful use.

Salamatof took a timely appeal of this decision to the superior court. The parties by stipulation added parcels on which the assessor made no ruling. In the superior court this case was consolidated with the appeal of Cook Inlet Region, Inc.[1]

### B. *Appeal of Cook Inlet Region, Inc.*

Cook Inlet Region, Inc. (CIRI) is a regional corporation under ANCSA and an Alaska business corporation. The tax

---

1. Both corporations also brought original actions seeking a tax refund under AS 29.45.-500(a). These cases were consolidated with the present administrative appeal.

years in question are 1981 through 1986 involving some 67 parcels. CIRI paid its taxes and appealed to the borough assessor. On January 27 and June 4, 1986, hearings were held before the assessor. The assessor ruled that a number of parcels were exempt, but denied exemptions as to many others. In general, the grounds for denial were that the parcels are considered developed as they are surveyed or subdivided lots capable of gainful and productive present use and need no further modification to be marketable. From this decision CIRI appealed to the superior court.

## COURSE OF PROCEEDINGS IN THE SUPERIOR COURT

After procedural skirmishes and a substantial period of delay by the borough in filing its appellee's brief, the trial court entered a written decision ruling that all the parcels, with one exception, were "clearly undeveloped" and thus tax exempt. The excepted parcel, the so-called Homer radio station property owned by CIRI, was remanded to the assessor for further proceedings. Final judgments in favor of CIRI and Salamatof were entered pursuant to Civil Rule 54(b) as to all of the parcels except the parcel containing the radio station.

CIRI moved for full attorney's fees and costs of $30,761.48 and for an award of sanctions against the borough of $2,500. Salamatof made a similar motion, requesting actual attorney's fees of $64,258, actual costs of $4,088.92, and sanctions of $2,400.

The borough asked for and received an extension in which to oppose these motions. When this period ended it requested a further extension. While this request was pending the trial court awarded CIRI and Salamatof what they had asked for in actual attorney's fees, costs, and sanctions, noting that no opposition had been filed.

On appeal to this court, the borough challenges the superior court's ruling that CIRI's and Salamatof's property is exempt and the award of actual attorney's fees and sanctions.[2]

## FAILURE TO ASSERT AN EXEMPTION

As a threshold matter, the borough argues that neither CIRI nor Salamatof asserted that its property was exempt in a timely manner for the tax years 1981–1985. The borough relies on section 2 of Kenai Peninsula Borough (KPB) Ordinance 5.12.-055, passed in 1985, which sets forth the procedure for appealing tax assessments to the borough assessor. Section 2 provides

> [t]hat appellants who have claimed or asserted that properties are exempt prior to the time taxes were due for that year but whose properties have been assessed by the Borough assessing staff for the 1985 assessment year and all prior assessment years, have until December 31, 1985 to appeal such assessments pursuant to the procedures established under Section 1 of the ordinance; except that no appeal right under this ordinance shall exist if the property claimed to be exempt has been the subject of a final determination of taxes due through a tax foreclosure or other legal action.

The borough argues that the taxpayers under this section were required to have asserted their exemptions prior to the yearly tax due date of August 15, and that they did not do so.

■ The borough assessor found that Salamatof did not protest the taxation of its parcels in a timely manner for the tax years 1981–1983. The superior court reversed the assessor's ruling on this point, stating that the ordinance "was enacted especially to deal with the taxpayers' complaints."

The trial court's conclusion concerning the purpose of the ordinance is warranted in part. The ordinance was designed to accommodate the appeals of Native corporations for years prior to 1985. However,

2. The borough includes within its appeal the trial court's decision concerning the Homer radio station property. As there has been no final judgment concerning this property, it should not be considered part of the appeal. However, because the issues concerning taxation of the radio station property are closely related to the issues presented on appeal, we consider this aspect of the borough's appeal to be a petition for review from a non-final order. We grant the petition and consider the taxability of the radio station property in this opinion.

the ordinance requires as a condition of appeal that an appellant "have claimed or asserted" an exemption "prior to the time taxes were due for that year." This condition cannot be read out of the ordinance.

There was substantial evidence to support the assessor's ruling that Salamatof failed to object to taxation of its property in a timely fashion for the tax years 1981 through 1983. The first assertion of immunity appearing of record was made January 23, 1984, when Salamatof made a late payment of its 1983 taxes under protest. Accordingly, the assessor's ruling should have been affirmed.[3]

Although the ordinance on which the borough relies was not enacted until 1985, statutory procedures existed prior to that time for obtaining a refund of taxes paid under protest. AS 29.45.500. Such actions were barred if not brought within one year after the due date of the tax. AS 29.45.500(b). In addition, a statutory right of appeal from assessments existed prior to the ordinance under AS 29.45.190 and AS 29.45.200(c). These, however, had to be exercised within 30 days after the date of mailing of the notice of assessment. The deadlines for both of these methods had passed by the time Salamatof first initiated action as to the tax years 1981 through 1983.

The assessor found that Salamatof's protests were on time for the years 1984 and 1985. The ordinance only requires that taxpayers claim or assert exemptions. KPB Ordinance § 5.12.055(2). No particular form of claim or assertion is required. Since it appears that Salamatof began protesting taxation beginning January 23, 1984, prior to the time taxes were due for 1984, we conclude that the assessor's decision that Salamatof's protest for 1984 and 1985 were timely under the ordinance is supportable.

By the same standard, CIRI's protests are timely for all tax years in question as it had been protesting taxation since 1981.

We thus conclude that the borough's argument concerning the timeliness of Salamatof's appeal for 1981 through 1983 is correct and that all of Salamatof's property involved in this case was taxable for those years. The borough's timeliness arguments concerning Salamatof's property for 1984 and 1985 and CIRI's property for all of the tax years lack merit.

## STATUTORY FRAMEWORK FOR THE CLAIMS OF EXEMPTION

There are four statutes which are relevant to the exemption issue. The first is ANCSA, enacted by Congress in 1971 to extinguish Alaska Natives' claims to aboriginal title and to grant compensation for those claims. As noted, section 21(d) of ANCSA (43 U.S.C. § 1620(d)) provided that lands conveyed under ANCSA would be tax exempt for 20 years except for developed lands or lands leased to third parties.[4]

The legislative history of section 21(d) of ANCSA has been described as "sparse." Price, Purtich and Gerber, *The Tax Exemption of Native Lands Under Section 21(d) of the Alaska Native Claims Settlement Act*, 6 U.C.L.A.Alaska L.Rev. 1, 3 (1976) (hereafter "Price"). Price's explanation of the purpose the exemption is as follows:

> That municipal taxes, local real property taxes, or local assessments may be imposed upon leased or developed real property within the jurisdiction of any governmental unit under the laws of the State: *Provided further,* That easements, rights-of-way, leaseholds, and similar interests in such real property may be taxed in accordance with State or local law. All rents, royalties, profits, and other revenues or proceeds derived from such property interests shall be taxable to the same extent as such revenues or proceeds are taxable when received by a non-Native individual or corporation.

---

3. Salamatof's claim that the borough ordinance allows the filing of claims raised at any time prior to *foreclosure* is without merit. The same is true of its contention that the borough's decision to permit consideration of only those tax protests raised prior to the tax due date is somehow violative of due process.

4. Section 21(d) of ANCSA initially provided:
   Real property interests conveyed, pursuant to this chapter, to a Native individual, Native Group, or Village or Regional Corporations which are not developed or leased to third parties shall be exempt from State and local real property taxes for a period of twenty years after [December 18, 1971]: *Provided,*

Section 21(d), as part of the Alaska Native Claims Settlement Act, is most clearly a provision implementing the policy of gradual adjustment to the economic mainstream. The twenty year moratorium on taxation of undeveloped and unleased land serves as a period during which the Natives can experiment in financial and real estate transactions and achieve managerial capability, without fear of immediate tax burdens arising from the ownership of vast tracts of undeveloped land. Furthermore, the tax moratorium permits the Natives to pursue a traditional subsistence lifestyle, at least temporarily, without the need to exploit hunting grounds in order to raise revenue for taxation. An exemption is also important because of the danger of foreclosure for nonpayment and the possibility of rapid movement of land ownership from Native to non-Natives.

Price at 6.

While this is an explanation for the moratorium on taxation, it does not explain the exception to the moratorium for developed or leased land. Price describes the draftsmen of ANCSA as "generally hostile to [tax] exemptions." *Id.* at 5. However, "[t]here is evidence that the moratorium on taxation was a bargained-for compensation and part of the liquidation of the Native claim." *Id.* at 6.

The influential report of the Federal Field Committee for Development Planning in Alaska, *Alaska Natives and the Land* (U.S. Government, Anchorage, 1968) discusses the tax exemption problem as follows:

Tax exemptions *could* have significant fiscal implications for the state and local government. The real estate exemption of S.B. 3586, for instance, keeps all lands granted off the property tax rolls whether they are "in fee or in trust." This provision applies as well to any minerals associated with the land grant which could otherwise be made subject to *ad valorem* levies where tax bodies existed. Conceivably, these sums might amount to considerable amounts of public receipts foregone. Some caution is appro-

priate here, however, in that too early and too much land taxation can result in confiscation of the land, which result would clearly be counter-productive to the policy resolution intended.

*The problem here seems to be to distinguish among the different purposes for which land might be granted.* In the case of homesites, fishing camps, and the like, or of lands granted to protect subsistence activities, maximum insurance is required against confiscation because of the owner's inability to pay taxes. In the case of grants of commercially valuable land for income purposes, however, the point is to get them into a productive, income-earning position and, indeed, to get them *on* the tax rolls. To the extent that these lands are in fact capable of producing income, there is no obvious justification for keeping them off the tax rolls simply because they happen to be owned by Natives or Native groups.

*Id.* at 531 (emphasis in original).

From the committee standpoint at least, land capable of producing income which was selected for its income producing potential should be taxable in fairness to the state and local governments. This sentiment seems to have been carried forward to the final enactment of ANCSA, as illustrated by the Congressional declaration that there be no addition to the categories of property enjoying special tax privileges, 43 U.S.C. § 1601(b), and in the provision of section 21(d) of ANCSA itself, providing that developed or leased property is immediately taxable.

The next act of importance to this case is the Alaska National Interest Lands Conservation Act of 1980, P.L. 96–487 (ANILCA). ANILCA, so far as relevant here, amended section 21(d) to begin the running of the 20–year exemption period "from the vesting of title pursuant to the Alaska National Interest Lands Conservation Act or the date of issuance of an interim conveyance or patent, whichever is earlier...."

ANILCA also created the Alaska Land Bank program. 43 U.S.C. § 1636. Under this program, private land owners, including Native corporations, could make agree-

ments with the Secretary of the Interior so that their lands would be managed in a manner compatible with the management plan for adjoining federal lands. As to lands owned by Native corporations which were included in such agreements, ANILCA provided that there would be permanent immunity from state and local property taxes. 43 U.S.C. § 1636(d).

In addition, ANILCA expanded the tax exemption to reach property used "solely for the purposes of exploration" and added language to the first proviso of section 21(d) of ANCSA which was aimed at re-establishing tax exemption when property was no longer "leased or being developed." [5]

In 1983 the Alaska Legislature passed Senate Bill 260 (effective January 1984), which added property exempt under ANCSA to the list of property exempt from taxation. AS 29.45.030(a)(7). The legisla-

ture then defined the meaning of the term "developed," among other terms used in ANCSA, "unless superseded by applicable federal law" as follows:

"developed" means a purposeful modification of the property from its original state that effectuates a condition of gainful and productive present use without further substantial modification; surveying, construction of roads, providing utilities or similar actions normally considered to be component parts of the development process, but which do not create the condition described in this paragraph, do not constitute a developed state within the meaning of this paragraph; developed property, in order to remove the exemption, must be developed for purposes other than exploration, and be limited to the smallest practicable tract of the property actually used in the developed state; [6]

**5.** 43 U.S.C. § 1620(d)(1) as amended by ANILCA reads:

Real property interests conveyed, pursuant to this chapter, to a Native individual, Native Group, Village or Regional Corporation or corporation established pursuant to section 1613(h)(3) which are not developed or leased to third parties or which are used solely for the purposes of exploration shall be exempt from State and local real property taxes for a period of twenty years from the vesting of title pursuant to the Alaska National Interest Lands Conservation Act or the date of issuance of an interim conveyance or patent, whichever is earlier, for those interests to such individual, group, or corporation: *Provided,* That municipal taxes, local real property taxes, or local assessments may be imposed upon any portion of such interest within the jurisdiction of any governmental unit under the laws of the State which is leased or developed for purposes other than exploration for so long as such portion is leased or being developed: *Provided further,* That easements, rights-of-way, leaseholds, and similar interests in such real property may be taxed in accordance with State or local law. All rents, royalties, profits, and other revenues or proceeds derived from such property interests shall be taxable to the same extent as such revenues or proceeds are taxable when received by a non-Native individual or corporation.

**6.** AS 29.45.030 provides:

(a) The following property is exempt from general taxation:
. . . .

(7) real property or an interest in real property that is exempt from taxation under 43 U.S.C. 1620(d), as amended.

. . . .

(m) For the purpose of determining property exempt under (a)(7) of this section, the following definitions apply to terms used in 43 U.S.C. 1620(d) unless superseded by applicable federal law:

(1) "developed" means a purposeful modification of the property from its original state that effectuates a condition of gainful and productive present use without further substantial modification; surveying, construction of roads, providing utilities or other similar actions normally considered to be component parts of the development process, but that do not create the condition described in this paragraph, do not constitute a developed state within the meaning of this paragraph; developed property, in order to remove the exemption, must be developed for purposes other than exploration, and be limited to the smallest practicable tract of the property actually used in the developed state;

(2) "exploration" means the examination and investigation of undeveloped land to determine the existence of subsurface nonrenewable resources;

(3) "lease" means a grant of primary possession entered into for gainful purposes with a determinable fee remaining in the hands of the grantor; with respect to a lease that conveys rights of exploration and development, this exemption shall continue with respect to that portion of the leased tract that is used solely for the purpose of exploration.

(n) If property or an interest in property that is determined not to be exempt under (a)(7)

The last act of relevance is Public Law 100–241, 101 Stat. 1806, the Alaska Native Claims Settlement Act Amendments of 1987. This act extended the Alaska Land Bank tax exemption to all lands conveyed under ANCSA, regardless of whether they are subject to a Land Bank Agreement, "so long as such land and interests are not developed or leased or sold to third parties...." 43 U.S.C. § 1636(d)(1)(A)(ii). Also, the act defines "developed" in terms which at the outset are substantially identical to the terms used in the 1983 state statute, but which go on to specify that land which is subdivided under an approved and recorded subdivision plat is "developed".[7] 43 U.S.C. 1636(d)(2)(B)(iii).

of this section reverts to an undeveloped state, or if the lease is terminated, the exemption shall be granted, subject to the provisions of (a)(7) and (m) of this section.

7. The 1987 amendments to ANCSA provide:

43 U.S.C. § 1636(d) Automatic protections for lands conveyed pursuant to the Alaska Native Claims Settlement Act.

(1)(A) Notwithstanding any other provision of law or doctrine of equity, all land and interests in land in Alaska conveyed by the Federal Government pursuant to the Alaska Native Claims Settlement Act [43 U.S.C.A. § 1601 et seq.] to a Native individual or Native Corporation or subsequently reconveyed by a Native Corporation pursuant to section 39 of that Act [43 U.S.C.A. § 1629(e) ] to a Settlement Trust shall be exempt, so long as such land and interests are not developed or leased or sold to third parties from—

. . . .

(ii) real property taxes by any governmental entity;

. . . .

(2) Definitions. (A) For purposes of this subsection, the term—

(i) "Developed" means a purposeful modification of land, or an interest in land, from its original state that effectuates a condition of gainful and productive present use without further substantial modification. Surveying, construction of roads, providing utilities, or other similar actions, which are normally considered to be component parts of the development process but do not create the condition described in the preceding sentence, shall not constitute a developed state within the meaning of this clause. In order to terminate the exemptions listed in paragraph (1), land, or an interest in land, must be developed for purposes other than exploration, and the exemptions will be terminated only with respect to the smallest practicable tract actually used in the developed state;

(ii) "Exploration" means the examination and investigation of undeveloped land to determine the existence of subsurface nonrenewable resources; and

(iii) "Leased" means subjected to a grant of primary possession entered into for a gainful purpose with a determinable fee remaining in the hands of the grantor. With respect to a lease that conveys rights of exploration and development, the exemptions listed in paragraph (1) shall continue with respect to that portion of the leased tract that is used solely for the purposes of exploration.

(B) For purposes of this subsection—

(i) land shall not be considered developed solely as a result of—

(I) the construction, installation, or placement upon such land of any structure, fixture, device, or other improvement intended to enable, assist, or otherwise further subsistence uses or other customary or traditional uses of such land, or

(II) the receipt of fees related to hunting, fishing, and guiding activities conducted on such land;

(ii) land upon which timber resources are being harvested shall be considered developed only during the period of such harvest and only to the extent that such land is integrally related to the timber harvesting operation; and

(iii) land subdivided by a State or local platting authority on the basis of a subdivision plat submitted by the holder of the land or its agent, shall be considered developed on the date an approved subdivision plat is recorded by such holder or agent unless the subdivided property is a remainder parcel.

. . . .

(4) Exclusion, reattachment of exemptions.

. . . .

(C) If the exemptions listed in paragraph (1) are terminated with respect to land, or an interest in land, as a result of development (or a lease to a third party), and such land, or interest in land, subsequently reverts to an undeveloped state (or the third-party lease is terminated), then the exemptions shall again apply to such land, or interest in land, in accordance with the provisions of this subsection.

(5) Tax recapture upon subdivision plat recordation. (A) Upon the recordation with an appropriate government authority of an approved subdivision plat submitted by, or on behalf of, a Native individual, Native Corporation, or Settlement Trust with respect to land described in paragraph (1), such individual, corporation, or trust shall pay in accordance with this paragraph all State and local property taxes on the smallest practicable tract integrally related to the subdivision project that would have been incurred by the individual, corporation, or trust on such land (excluding the value of subsurface resources and timber)

The House explanatory statement to Public Law 100–241 discusses the term "developed" at length. The statement makes clear Congress' intent that, whatever else the word "developed" might mean, it encompasses lots in an approved and recorded subdivision:

> Land in Alaska is subdivided by the State or by local platting authorities. Action by the appropriate platting authority enables development of the subdivided property. Regardless of whether a tract of land has been physically modified from its original state, the tract is 'developed' from the date an approved subdivision plat is properly recorded by the landowner or his or its authorized agent.

House Explanatory Statement, 100th Cong., 1st Sess. § 11, *reprinted in* 1987 U.S.Code Cong. & Admin.News 3299, 3311.

## DISCUSSION OF THE MERITS

■ The borough argues that there is a generally accepted meaning of the term "developed" in the context of land. This meaning is, "converted into an area suitable for residential or business uses." The borough contends that this definition encompasses land which has been platted and is ready for sale. The borough argues that Congress intended that the term "developed" would mean this in section 21(d) of ANCSA. Further, the borough argues that if the state law definition of "developed" exempts property that would not be exempt under ANCSA, state law is unconstitutional because non-Native corporation owners of property identical in character and use are not afforded the same tax exemption.

The appellees argue that in order to be "developed" under ANCSA, property must be actually productive of income rather than merely potentially productive. Appellees contend that AS 29.45.030 is consistent with ANCSA. Alternatively, they argue that there is no common or ordinary meaning of the term "developed," that it is ambiguous, and that therefore the rule of construction that in Indian law all ambiguities must be resolved in favor of Indians should control this case and requires a construction which exempts any parcel which had not been purposefully modified and is not presently economically productive.

The meaning of the term "developed" under ANCSA is a question of federal law. Consequently, the primary consideration in determining meaning is the intent of Congress. Although it is well established that ambiguities in ANCSA are to be resolved favorably to Natives, *Alaska Public Easement Defense Fund v. Andrus*, 435 F.Supp. 664, 670–71 (D.Alaska 1977); *People of South Naknek v. Bristol Bay Borough*, 466 F.Supp. 870, 873 (D.Alaska 1979), if congressional intent is clear, we must defer to it. *Hakala v. Atxam Corp.*, 753 P.2d 1144, 1147 (Alaska 1988).

One indication of congressional intent is the ordinary meaning of the words used in the statute. In the context of raw land,[8] the common meaning of "developed" includes subdivided property which is ready for sale. *Webster's Third New Interna-*

---

in the absence of the exemption described in paragraph (1)(A)(ii) during the thirty months prior to the date of the recordation of the plat.

(B) State and local property taxes specified in subparagraph (A) of this paragraph (together with interest at the rate of 5 per centum per annum commencing on the date of recordation of the subdivision plat) shall be paid in equal semi-annual installments over a two-year period commencing on the date six months after the date of recordation of the subdivision plat.

(C) At least thirty days prior to final approval of a plat of the type described in subparagraph (A), the government entity with jurisdiction over the plat 'shall notify the submitting individual, corporation, or trust of the estimated tax liability that would be incurred as a result of the recordation of the plat at the time of final approval.

. . . .

(6) Savings.

. . . .

(B) Enactment of this subsection shall not affect any real property tax claim in litigation on the date of enactment [February 3, 1988].

8. Since ANCSA contemplated a transfer of 44 million acres of public land, an area larger than the state of Washington, raw land is the general context in which Congress was speaking. As the 1987 Senate Report states, the conveyance included "tens of millions of acres of land which is only valuable as wildlife habitat." S.Rep. No. 201, 100th Cong., 1st Sess. 21, *reprinted in* 1987 U.S.Code Cong. & Admin.News 3269, 3271.

*tional Dictionary of the English Language,* Unabridged (1968), defines "develop" in a land context as follows:

> to make actually available or usable (something previously only potentially available or usable)....: as (1): to convert (as raw land) into an area suitable for residential or business purposes [they ēd several large tracts on the edge of town]; also: to alter raw land into (an area suitable for building) [the subdivisions that they ˜ed were soon built up]....

Cases dealing with the term "developed" in the context of land confirm that "develop" connotes conversion into an area suitable for use or sale. *Winkelman v. City of Tiburon,* 32 Cal.App.3d 834, 108 Cal. Rptr. 415, 421 (1973) ("The term 'developed' connotes the act of converting a tract of land into an area suitable for residential or business uses."); *Muirhead v. Pilot Properties, Inc.,* 258 So.2d 232, 233 (Miss. 1972) (same holding); *Prince George's County v. Equitable Trust Co.,* 44 Md. App. 272, 408 A.2d 737, 742 (1979) ("Develop [is defined as] the conversion of raw land into an area suitable for residential or business uses.") (Quoting *Webster's New International Dictionary,* (2d Ed.1959)); *Best Building Co. v. Sikes,* 394 S.W.2d 57, 63 (Tex.App.1965) (court approved trial court finding based in part on extrinsic evidence that "developed" included subdividing, building streets, and installing utilities).

The appellees' position that in order to be developed property must actually be producing income is not supported by any generally accepted definition of the term. It would mean, for example, that a vacant office building located on a city lot is undeveloped. Since having an income producing character is not a necessary component of the word "developed" in ordinary usage, we reject the appellees' interpretation.

At the hearing before the assessor, CIRI advocated a different definition of developed. CIRI took the view that a small tract of land was developed if profits from its sale would be maximized without further physical or legal alteration.

CIRI's position was illustrated by Steve Planchon, its land development manager:

> [W]e do have ... nine, ten properties ... that we decided not to appeal.... They're one acre tracts. There's something that we can't do anything further. We can't subdivide them, we can't put a road in, the power isn't there. These things are there—it's something if a guy came to us tomorrow and said, "[L]isten, I'd like to sell it to you [sic]," and my boss came in and said "[W]ell before we sell it to him, what else can we do it, you know, can we make any more money off of this piece of property?" I'd say to him no. I'd say there's a fair market value for that piece of land. I can't do a thing else to enhance the value. That's a piece of property that we leave out of our appeals.... [I]f my boss came in tomorrow and said we've got a guy in here that wants to buy that 5–acre tract and ... he wants to develop it, he says "can you guys do anything else to enhance the property value on that?" My answer to him would be yes ... and we take that on as land department project, enhance the values.... We would put in roads. We would do the subdivision design and we would carry those costs up until we sell the property and make the profit throughout the process. There's no reason for us to give the profit away.
>
> ....
>
> [S]eems that we're arguing about is do you take it down to five acres. Do you take it to two acres. Do you take it to one acre. And our answer would be that, uh, from CIRI's point of view, it's not developed unless we can't get an additional dollar out of it from doing something else to the property.

Mark Friedman, CIRI's land management officer, gave another example:

> And here it's probably a good instance to look at the criteria that we've used to determine what should be taxed and what shouldn't be taxed, in terms of whether the property is in a developed state or isn't in a developed state. If we look at that one, tract 8 is in fact appropriately being taxed. We've got a parcel

that's 1.86 acres. There is a—there's roads. Utilities are right on the boundary of the property. The fact is that we would not have to do anything, expend any monies to sell that property ... as a developed state.

CIRI's position at the hearing before the assessor is consistent with the common meaning of developed. CIRI regarded its land as developed when it had been converted into an area suitable for sale in both a legal and a practical sense. The legal sense of suitability for sale is that a parcel of land may not be divided into two or more parcels for sale without an approved and recorded plat. AS 40.15.010. *See Kenai Peninsula Borough v. Kenai Peninsula Board of Realtors, Inc.*, 652 P.2d 471, 472 (Alaska 1982). The practical sense is that as to some parcels which legally may be sold, a knowledgeable developer desiring to maximize revenue would not sell without re-platting or making additional improvements. In our view the word "developed" as used by Congress in ANCSA includes parcels which are not only legally but practically suitable for sale under these standards.[9]

We do not mean that a particular piece of property is "developed" simply because a market exists for its sale. Although these parcels did not present this situation, it is conceivable that a Native corporation that is not itself a land developer would sell raw land that would not generally be considered developed. Land that common sense tells us is not developed does not become taxable simply by virtue of a market existing for its sale in its unimproved state; to be within this definition of "developed" the land must be practically and legally suitable for sale to the ultimate user.

■ It is our view that AS 29.45.030 is consistent with ANCSA with respect to the meaning of developed. The definition of

developed in that statute is broad enough to include subdivided land which is ready for sale. Subdividing is legally a purposeful modification of property, for it enables separate parts of the property to be sold. Similarly, as a sale of property is a use, a subdivision which suffices to permit sales effects a gainful and productive condition.

We reach this conclusion for two reasons. First, AS 29.45.030(a)(7) expressly exempts only property which is also exempt under ANCSA. Second, if we were to construe the state statute to exempt property which is not exempt under ANCSA, serious · questions concerning the constitutionality of the statute as so construed under the equal rights clause of the Alaska Constitution would be raised.[10] Because statutes are to be construed to avoid a substantial risk of unconstitutionality where adopting such a construction is reasonable, we construe the state statute to be co-extensive with ANCSA.[11]

## IS SALAMATOF'S PROPERTY DEVELOPED?

Salamatof's property can be divided into the three general categories; (1) subdivided lands in Moose Range Meadows Subdivision, (2) unsubdivided parcels in Moose Range Meadows Subdivision, and (3) two parcels in North Kenai. We discuss these below.

### (1) *Moose Range Meadows Subdivision*

■ This subdivision was created by Salamatof. Its plat has been approved and recorded. Roads have been dedicated and constructed and utilities are available to the subdivision lots and Salamatof is actively marketing the property. The lots themselves have not been leveled or cleared. There are 142 Moose Range Meadows Subdivision lots involved in this appeal. As the subdivision has made these lots suitable for

---

9. We do not imply that this is all "developed" means. Obviously land which has been improved with buildings or other structures is also developed. *See Kenai Peninsula Borough v. Tyonek Native Corp.*, 807 P.2d 502 (Alaska 1991).

10. The equal rights clause of the Alaska Constitution is contained in article I, section 1, which

provides "that all persons are equal and entitled to equal rights, opportunities, and protection under the law[.]"

11. *State v. Fairbanks North Star Borough*, 736 P.2d 1140, 1142 (Alaska 1987).

sale, they are developed within the meaning of section 21(d) of ANCSA.

### (2) *Unsubdivided parcels in Moose Range Meadows*

■ These are four unsubdivided parcels ranging in size from 80 acres to 27 acres. They are adjacent to subdivided lots in Moose Range Meadows and they have road access. An electrical line runs along the road which they front.

Since these four parcels have not been subdivided and are substantially larger than the adjacent parcels which have been subdivided, we conclude that they are not suitable for sale from the standpoint of a knowledgeable owner wishing to maximize profits and thus they should not be considered developed.

### (3) *North Kenai parcels*

■ These are two vacant parcels which lie along the bluff of the eastern shore of Cook Inlet, 14 miles north of the City of Kenai. They are 36 and 42 acres in size and have no regular road access. They have not been subdivided and according to the testimony at the hearing before the assessor, cannot reasonably be made marketable until roads are installed. Since these parcels are not suitable for sale at present, they are not developed under the standards announced above.

## IS CIRI'S PROPERTY DEVELOPED?

CIRI's property is not easy to categorize. The borough breaks it down into five categories, which are somewhat overlapping. They are: (1) platted and subdivided parcels; (2) surveyed land which is divided into government lots; (3) surveyed land which has utilities available to it; (4) lake front property; and (5) the Homer radio station property. The parties' briefs contain no comprehensive discussion of the characteristics of the parcels falling within the first four categories. Our review of the record reveals that in none of the categories is it clear that all of the property is either taxable or exempt.

With respect to the first category, platted and subdivided parcels, it appears that most of the lots owned by CIRI in the Stephenkie Subdivision are developed. However, at least two lots, 066–380–21 and 065–530–17, are substantially larger than the other lots in the subdivision and may not be suitable for sale without resubdividing.

In the second category, surveyed land which is divided into government lots, fall various township lots. CIRI claims that some of these are too large to be suitable for sale, e.g., parcel 133–120–20, a 7.9–acre parcel in the township of Kasilof, fronting the Sterling Highway. In other cases CIRI claims that they are too small and would have to be replatted with adjoining property, e.g., parcels 133–130–10 and 11, two quarter-acre lots in the Kasilof townsite.

The third category, surveyed land which has utilities available to it, seems to overlap with the second category as utilities are available to some of the land which the borough has placed in the earlier category. In any case, this category includes two 2.5–acre lots in the city of Kenai, fronted by streets and served by all utilities. (Tracts 045–070–03 and 045–210–01.) The borough argued at the hearing before the assessor that the parcels were appropriate for sale as is and CIRI contended that it would not sell the tracts without first subdividing them into parcels of one acre.

The fourth category is lake front property. Some of these are clearly suitable for sale as they are. For example, parcels 013–042–04, 12, 20 are parcels less than two acres in size, not adjacent to other CIRI lands. CIRI acknowledged that as to these properties there could be no further steps that could be taken to improve their marketability. As to other parcels in this category, CIRI contends that they should be subdivided, e.g., parcel 012–010–14, a 5–acre tract bordering a lake and Cook Inlet, which CIRI contends it would divide into two 2.5–acre parcels.

Since the taxability or exemption of the property in these four categories was not addressed in the superior court under appropriate legal standards, a remand to the superior court for such a determination is

necessary. The superior court may in turn remand some or all of these properties to the assessor if it appears that the assessor's findings are inadequate or that he used an improper standard.

■ The Homer radio station property must be remanded for a different reason. This 16-acre parcel is in downtown Homer. It is served by roads and utilities and contains various structures, including several buildings, a radio tower and a network of cables and antennae. The property is used by a public radio station which pays CIRI $500 per year for the privilege. In our view, that portion of the property which is built on is clearly developed. A remand, however, is necessary to limit the land subject to taxation to the smallest practicable tract which is actually developed.[12] AS 29.45.030(m)(1). Even though this statute only applies to the tax years after 1984, we consider the smallest practicable tract requirement of the statute to be a sensible construction of ANCSA. The superior court is thus directed to determine the smallest practicable tract which shall be considered developed within the Homer property for all tax years involved in this case.

## SANCTIONS

The superior court awarded sanctions to CIRI of $2,500 and to Salamatof of $2,400 against the borough. The corporations requested these amounts for the legal expenses expended responding to two borough motions which the corporations claimed were frivolous, and for legal expenses incurred preparing revisions to their reply briefs after the borough had changed its brief in violation of a briefing deadline.

Sanctions in administrative appeals are governed by Appellate Rule 510.[13] Part (a) of Appellate Rule 510 allows sanctions in addition to interest, costs and attorney's fees where an appeal or a petition for review is filed merely for delay. Part (b) of Appellate Rule 510 allows the assessment of costs or attorney's fees for any infraction of the appellate rules. Part (c) allows the assessment of a fine not to exceed $500 against any attorney who fails to comply with the appellate rules or any rules promulgated by the supreme court. Although the superior court did not specify under which subsection of Appellate Rule 510 it made its sanction award, the award can only be justified under subsection (b). Subsection (c) seems not to have been intended because the sanctions were directed against the borough rather than the borough attorneys. Subsection (a) speaks to delay on the part of an appellant or a petitioner. It is thus inapplicable to the dilatory conduct of the borough in this case, as the borough was the appellee.

■ The borough did not file a timely opposition to the corporations' motions for sanctions. Accordingly, the borough has waived its right to object to them on appeal except on plain error grounds. *In re L.A.M.*, 727 P.2d 1057, 1059 (Alaska 1986); *A.R.C. Industries v. State*, 551 P.2d 951, 961 (Alaska 1976). We have observed that plain error exists where "an obvious mistake has been made which creates a high likelihood that injustice has resulted." *Miller v. Sears*, 636 P.2d 1183, 1189 (Alaska 1981).

---

12. This point was raised by CIRI in its appeal to the superior court.

13. Appellate Rule 510 provides:
    (a) **When Appeal Brought for Delay.** Where an appeal or petition for review shall delay the proceedings in the trial court or the enforcement of the judgment or order of the trial court, and shall appear to have been filed merely for delay, monetary sanctions may be awarded in addition to interest, costs and attorney's fees.
    (b) **Infraction of Rules.** For any infraction of these rules, the appellate court may withhold or assess costs or attorney's fees as the circumstances of the case and discouragement of like conduct in the future may require; and such costs and attorney's fees may be imposed upon offending attorneys or parties.
    (c) **Fines.** In addition to its authority under (a) and (b) of this rule and its power to punish for contempt, the appellate court may, after reasonable notice and an opportunity to show cause to the contrary, and after hearing by the court, if requested, impose a fine not to exceed $500 against any attorney who practices before it for failure to comply with these rules or any other rules promulgated by the Supreme Court.

■ We find that the possibility of plain error exists in this case in one respect. The trial court awarded full attorney's fees to the corporations independent of the award of sanctions under Appellate Rule 510(b). Since 510(b) sanctions are limited to costs and attorney's fees, there will be an impermissible double recovery of attorney's fees if both the awards of sanctions and the awards of attorney's fees were allowed to stand. However, at this juncture the sanction awards need not be reversed because, as noted below, the awards of attorney's fees must be vacated.

## ATTORNEY'S FEES

The superior court awarded both corporations their actual attorney's fees. The awards included legal expenses incurred at the administrative level at the hearings before the assessor. The corporations' motions for attorney's fees were combined with their motion for sanctions and were ·not opposed by the borough. We thus will review the awards only for plain error.

■ A superior court acting as a court of appeal· from the decision of an administrative agency has authority to make an award of attorney's fees under Appellate Rule 508(e). Appellate Rule 601(b). Ordinarily, where such an award is made it should only partially compensate the prevailing party for attorney's fees and be limited to attorney's fees incurred in court, not those incurred in a prior administrative proceeding. *McMillan v. Anchorage Community Hospital*, 646 P.2d 857, 867 (Alaska 1982); *State v. Smith*, 593 P.2d 625, 630–31 (Alaska 1979); *Kodiak Western Alaska Airlines, Inc. v. Bob Harris Flying Service, Inc.*, 592 P.2d 1200, 1204–05 (Alaska 1979); Appellate Rule 508(b), (c), and (e). However, actual costs and attorney's fees may be awarded where authorized by statute. Further, actual costs and attorney's fees may be awarded

to a successful appellee where the court finds that the appeal is frivolous or has been brought simply for the purposes of delay. Appellate Rule 508(e). There is no explicit authority authorizing the award of actual costs and attorney's fees in favor of an appellee for frivolous conduct of a case on the part of an appellant. However, for specific misconduct on the part of either party, actual costs and fees may be awarded under Appellate Rule 510(b).

The trial court held that the corporations were entitled to actual attorney's fees and costs under AS 29.45.500(a) and, alternatively, that the corporations were entitled to actual attorney's fees under Appellate Rule 508 on the grounds that "the Borough's judicial action was replete with unexcused delay and frivolous action." The court concluded "that the entire Borough action was motivated by bad faith."

■ Alaska Statute 29.45.500(a) provides that in tax refund suits the successful taxpayer is entitled to a refund with interest plus "costs."[14] The trial court evidently construed the term "costs" as used in this statute to include attorney's fees. Further, the attorney's fees included within the statute were actual attorney's fees rather than the partial standard ordinarily contemplated under our rules. Finally, this statute was construed to apply to prior administrative proceedings as well as to proceedings in court. We do not find plain error with respect to any of these conclusions.

■ Nonetheless, we believe that the award of attorney's fees should be vacated because the ultimate disposition on the merits will be substantially different than the outright reversal ordered by the superior court. *See e.g.*, Appellate Rule 508(c) (in cases of reversal, costs shall be allowed the appellant unless otherwise ordered by the court; in cases of partial

**14.** AS 29.45.500(a) provides:
(a) If a taxpayer pays taxes under protest, the taxpayer may bring suit in the superior court against the municipality for recovery of the taxes. If judgment for recovery is given against the municipality, or, if in the absence of suit, it becomes obvious to the governing

body that judgment for recovery of the taxes would be obtained if legal proceedings were brought, the municipality shall refund the amount of the taxes to the taxpayer with interest at eight percent from the date of payment plus costs.

affirmance and partial reversal the court will determine which party, if any, shall be allowed costs). Further, it is apparent that the trial court's opinion concerning the bad faith, as distinct from the dilatory conduct, of the borough was influenced by the trial court's mistaken view as to the merits of the tax exemption issue. Finally, assuming AS 29.45.500(a) authorizes an award of actual attorney's fees for administrative and judicial proceedings, such fees should be apportioned and not awarded for those parcels for which taxes are due.

CONCLUSION

For the above reasons we conclude:

As to Salamatof Native Association, Inc.:

1. As to all properties for the tax years 1981 through 1983, the judgment is REVERSED.

2. As to Moose Range Meadows Subdivision for the tax years 1984 through 1986, the judgment is REVERSED.

3. As to the unsubdivided parcels in Moose Range Meadows Subdivision and the North Kenai parcels for the tax years 1984 through 1986, the judgment is AFFIRMED.

4. The award of sanctions is AFFIRMED.

5. The award of attorney's fees and costs is VACATED.

As to Cook Inlet Region, Inc.:

1. As to all parcels, the judgment is REVERSED and the matter is REMANDED for further proceedings in accordance with this opinion.

2. As to sanctions, the judgment is AFFIRMED.

3. As to costs and attorney's fees, the judgment is VACATED.