George A. STEPANOV and Laura Stepanov, husband and wife, and Gene Effler, Appellants/Cross–Appellees,

v.

HOMER ELECTRIC ASSOCIATION, INC., Appellee/Cross–Appellant,

State of Alaska and Alaska Public Utilities Commission, Appellees.

Nos. S–3410, S–3496 and S–3497.

Supreme Court of Alaska.

July 5, 1991.

LeRoy E. DeVeaux, DeVeaux and Associates, Anchorage, for appellants/cross-appellees Stepanov.

C. Michael Hough, Homer, for appellant/cross-appellee Effler.

C.R. Baldwin and Blaine D. Gilman, Law Offices of C.R. Baldwin, Kenai, for appellee/cross-appellant Homer Elec.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

This case involves several claims arising from contracts between Homer Electric Association, Inc., and developers, George A. Stepanov and Laura Stepanov, and Gene Effler (Developers).[1] All parties appeal the superior court's determination that the contracts were partially enforceable. In addition, the Developers contend that the superior court's resolution violated their rights under the United States and the Alaska Constitutions. We affirm the rulings of the trial court as to both of these issues. The parties also challenge the superior court's determinations regarding attorney's fees. We affirm the trial court's denial of attorney's fees for administrative proceedings in this matter and reverse its award of actual fees to the Developers for the appellate proceedings.

## I. FACTS AND PROCEEDINGS

Both of the Developers (Effler, and the Stepanovs) own real property which is within the service area of the Homer Electric Association, Inc. (HEA). The Developers began subdividing in the mid–1970's. At that time, HEA's policy for extension of electrical lines to newly developed lands provided that the cost of overhead line extensions was paid primarily by HEA.[2] The only time a property owner would incur

---

1. HEA contracted separately with the Stepanovs and with Effler. However, the agreements were virtually identical, and the Developers' independent challenges to HEA's subsequent actions have been consolidated. Therefore, this opinion will refer to "the contracts" or "the agreements" to indicate both Effler's agreement with HEA, and the Stepanovs' agreement with HEA. Where relevant, distinctions between the agreements are noted.

2. Overhead installations of up to 1,500 feet were provided at no extra cost to the consumer. For overhead line installations in excess of 1,500 feet, HEA merely required a refundable deposit and assessed higher-than-normal minimum charges for 36 months after the service was installed.

substantial costs in obtaining electrical service was if he or she wanted the lines installed underground. If an underground extension was requested, HEA still assumed the cost of basic (overhead) installation, but charged the customer for the additional expense of installing the lines underground.

The Developers wanted to assure that when individual purchasers arranged for electrical lines to be extended to their lots, the lines would be installed underground. To achieve this goal, they entered into agreements with HEA whereby the Developers would prepay the difference between HEA's costs for installing lines underground and overhead.[3] The Developers subsequently represented to purchasers that underground electrical lines would be extended to their property for nominal fees. Because the subdivisions were developed in phases, the agreements provided that payment of the differential for underground service would coincide with each phase of development.[4] Over the next several years, as each phase of development occurred, Effler and the Stepanovs paid in full the cost differential for underground service to that portion of their development, and HEA extended lines to the lots without any significant cost to the lot owners.

However, in 1981, HEA petitioned the Alaska Public Utilities Commission (PUC) for permission to change its line extension policy. The proposed policy change would allow HEA to bill landowners for the cost of extending overhead electrical lines to their property rather than bearing that expense itself. On January 11, 1982, the PUC granted HEA's petition. HEA subsequently revised its policy to include a tariff on overhead line extensions.[5] HEA did not notify the Developers that it was petitioning to change its rates for line extensions. They remained unaware of the new tariff until purchasers of lots in their subdivisions complained that HEA had assessed large fees for the extension of electrical lines to their property.

Effler and the Stepanovs each petitioned the PUC for review of HEA's new line extension tariff. Their petitions were consolidated and a hearing was held in early 1986. The Developers alleged that their contracts with HEA bound HEA to the policies in effect at the time the contracts were entered. Since the policy at that time was that HEA would bear the cost of overhead line extensions, the Developers argued that their contracts exempted their respective subdivisions from application of the new tariff. They also argued that the contract clause of the United States and Alaska Constitutions precluded modification of the contracts via retroactive rate revision. HEA responded that application of the revised tariff to the Developers' property did not affect the contracts. It interpreted the contractual payments to apply exclusively to the cost differential between overhead and underground extensions, and concluded that the contracts did not affect the charge that could be imposed for overhead service.

On August 21, 1986, a PUC hearing officer found that under the contracts, the Developers' prepayment of the cost differential covered the entire cost of extensions within the subdivisions. He then concluded that the contracts were "special contracts" pursuant to title 3, section 48.820(36) of the Alaska Administrative Code (AAC).[6] He

---

**3.** Effler executed an agreement concerning his subdivision on January 12, 1977. The Stepanovs' agreement was entered into on July 26, 1977.

**4.** Effler's development was to occur in ten phases, and his agreement with HEA contained quotes for each phase. Likewise, the Stepanovs' agreement contained quotes for each of the three phases of their development.

**5.** As to the Developers' property, their prepayments covered the difference between the cost of underground and overhead installation. Thus, although underground line installation was still guaranteed, application of the new tariff made the lot owner (rather than HEA) responsible for the portion of the installation expenses which would have been incurred even if the lines were installed overhead.

**6.** 3 AAC 48.820(36) (1986), defines a "special contract" as

a written agreement between a utility and a customer which contains rates, tolls, rentals or charges, or terms and conditions that devi-

further found that, although 3 AAC 48.390 provides that special contracts do not take effect without prior approval of the PUC, HEA could reasonably be expected to be aware of PUC regulations, whereas the Developers were "justifiably ignorant" of such requirements. Therefore, the hearing officer recommended that the PUC grant limited retroactive approval of the contracts until the time the Developers received notice that the revised tariff was applicable to their property. Based on his conclusion that the agreements were special contracts, he rejected the Developers' argument that application of the tariff after the period of PUC approval was an unconstitutional abrogation of a valid contract.

Both parties objected to the hearing officer's characterization of the agreements as special contracts. However, the PUC concluded that the contracts contained an implicit provision that the line extension rates in effect at the time the contracts were entered would control, even if HEA's policies were modified before installation of service. Accordingly, it adopted the hearing officer's recommendation and characterized the agreements as special contracts which it approved for the period prior to the dates on which the Developers received actual notice that the new tariff applied to their property.[7]

All parties appealed to the superior court. On May 3, 1989, the court affirmed the PUC's result on alternative grounds.[8] It rejected the Developers' request for attorney's fees for the administrative portion of their case, but awarded actual attorney's fees and costs for their appeal pursuant to Alaska Rules of Appellate Procedure 508(d) and (e).

All parties again appeal.

## II. CONTRACT INTERPRETATION

The proper interpretation of the contracts is the central issue in this dispute. We begin by analyzing the terms and conditions of the agreements to assess whether the PUC correctly determined that they are "special contracts."[9] When interpreting contracts, the goal is to "give effect to the reasonable expectations of the parties." *Mitford v. de Lasala*, 666 P.2d 1000, 1005 (Alaska 1983). In pursuit of this goal, the court must "look first to the written agreement itself and also to extrinsic evidence regarding the parties' intent at the time the contract was made." *Norton v. Herron*, 677 P.2d 877, 880 (Alaska 1984). We evaluate the contracts to assess whether the installation rates which HEA agreed to charge the Developers deviated substantially from the installation rates which it charged the general public. *See* 3 AAC 48.820(36).

---

ate substantially from those contained in the same utility's effective tariff for like service offered to the general public under comparable conditions, but excludes contracts that deviate from the serving utility's effective tariff only in respect to incidental matters. . . .

7. Effler learned that the new policy would be applied to his property in the fall of 1982. Stepanov did not learn of the effect of the revised tariff until 1984.

8. The superior court concluded that the agreements were not special contracts and, therefore, that they were enforceable without PUC approval. Thus, the revised tariff affected vested property interests, and the court ruled that due process required HEA to give the Developers actual notice of the PUC hearing. Because modification of the contracts was justified by a strong policy concern, the court determined that the due process violation was not fatal to the validity of the new tariff. However, the court held

that it was applicable to the Developers' property only from the date on which they received actual notice that the new tariff affected them.

The superior court also rejected the Developer's contract clause argument, holding that the exercise of state police power requires that contracts with heavily regulated industries be subject to modification.

9. When the superior court is acting as an intermediate court of appeal, we review the decision of the commission independently. *Barcott v. Department of Safety*, 741 P.2d 226 (Alaska 1987). The PUC's determination that the contracts are special contracts requires interpretation of agency regulations for which agency expertise is not necessary. Therefore, we will apply the substitution of judgment standard to the PUC's ruling. *See Earth Resources Co. of Alaska v. State Dept. of Revenue*, 665 P.2d 960, 964 (Alaska 1983); *Borkowski v. Snowden*, 665 P.2d 22 (Alaska 1983).

■ HEA attached a statement entitled, "Responsibilities of the Subdivider Pertaining to Underground Electric Distribution in Subdivisions" to the quote sheet for each of the agreements. The statement provides "actual construction of electric facilities will begin when a consumer makes application to H.E.A. for service and all normal fees and the above cost difference have been paid." The most natural interpretation of the language in the context of the contracts is that, following payment of the differential for underground service, installation of the lines was promised upon payment of "normal fees." The record clearly reflects that "normal fees" were nominal fees assessed for inspection of meters and other minor operations, and did not compensate HEA for the actual cost of extending electrical lines.[10] Thus, the agreements reflect an understanding that HEA was bound to the pre–1982 tariff policy under which HEA, rather than the consumer, was responsible for basic line extension expenses. In addition, all parties agree that the HEA's service policy was incorporated into the agreements. The Developers would reasonably have believed that they were governed by provisions in effect at the time they entered the contracts, such as the statement that "[y]our Association will be responsible for the cost of overhead facilities only."[11] Finally, additional evidence that the parties interpreted their agreement to require HEA to pay basic line extension expenses comes from a letter which accompanied the policy statement. The letter indicates "[f]acilities [will] be installed as necessary to serve any new consumers in this subdivision who … apply for service under [the] terms of the policy referred to above."[12]

We are persuaded that the terms of the contracts reflect the parties' intention to incorporate the installation policies in effect at the time the contracts were entered, thereby insulating the Developers from line extension tariff changes. Thus, they were special contracts; the installation policies applicable to the Developers "deviate[d] substantially" from HEA's "effective tariff for like service offered to the general public." 3 AAC 48.820(36).

Special contracts must be filed with the PUC and do not take effect without prior commission approval. AS 42.05.361; 3 AAC 48.390. Additionally, they must contain specific provisions itemized in 3 AAC 48.390. The contracts at issue clearly did not satisfy these conditions. However, we believe that the Developers were unaware of these requirements, and that they reasonably relied upon HEA to have knowledge of and comply with statutory and regulatory requirements governing public utilities. Therefore, we find that equity requires that the Developers be compensated for harm suffered during that period in which they remained ignorant of the contracts' nonconformance with applicable statutes and regulations. *See Asdourian*

10. During a prior similar transaction with HEA, Effler received correspondence from HEA which stated that "basic fees" amount to $30.00 and include membership, connect, meter inspect, and meter deposit fees. HEA admits that the new charges are "very definitely" an order of magnitude different from the charges which were formerly imposed for extensions greater than 1,500 feet.

11. While HEA's service policy, does state that "the service and extension policies are subject to change," the manual enumerates general policies affecting all customers. In light of their separate agreements with HEA, the Developers could reasonably assume that they had contracted for installation of service to their property according to the policies in effect at the time the agreements were entered and were thereafter insulated from changes to policies pertaining to installation.

12. HEA's conduct following the adoption of the new tariff is further evidence that it interpreted the contracts to insulate the Developers' property from policy changes affecting line installation rates. *Mitford*, 666 P.2d at 1005· ("[r]elevant extrinsic evidence can include subsequent conduct of the parties"). In 1984, an individual who had purchased land in the Stepanovs' subdivision notified Mr. Stepanov that HEA had indicated that it expected to charge him a substantial amount for a line extension to his property. Stepanov contacted HEA and asserted that the contract guaranteed installation of line extensions according to the conditions of HEA's former policy. HEA subsequently installed electrical service to the lot in question at no additional charge.

*v. Araj*, 38 Cal.3d 276, 211 Cal.Rptr. 703, 696 P.2d 95, 106 (1985) (enforceability of contracts which were not "intrinsically illegal," yet were made in violation of statute depended upon the factual context and public policies involved).

The Developers reasonably and detrimentally relied upon the contracts to the extent that they promised purchasers of lots within their subdivisions that line extensions could be obtained for a nominal cost. They would suffer harm if the revised tariff was applied to lots sold before they had notice that the contract did not insulate them from tariff increases. Consequently, partial enforcement of the contracts is appropriate in this case.

We find that the PUC's decision to grant limited retroactive approval of the contracts adequately compensated the Developers for any harm incurred through their reliance on the contracts with HEA. By exempting them from the line installation tariff until they received actual notice that new tariff would be applied to their property, the PUC allowed the Developers to enjoy a competitive advantage as to other developers in HEA's service area. We believe this advantage to be an adequate and appropriate remedy for their detrimental reliance upon the contracts and for any rights relinquished at the time they entered the contracts with HEA. As to lots sold after the notice of the tariff increase, we find no detrimental reliance upon the contracts.[13] Therefore, the PUC properly refused to enforce the contractual terms beyond the time the Developers received actual notice of the tariff revision.

The remedy prescribed by the superior court is consistent with these findings. Accordingly, we affirm the court's ultimate holding, but emphasize that our decision rests upon the reasoning set forth in this opinion.

## III. CONSTITUTIONAL ISSUES

■■■ The contract clause of the United States Constitution provides that "[n]o State shall ... pass any ... Law impairing the obligation of Contracts".[14] The Developers assert that the PUC effectively revised their contracts by allowing HEA to assess the new tariff against their property, and that such revision constitutes an unconstitutional abrogation of a contract.[15] However, the PUC's retroactive approval of the agreements extended only until the date the Developers received actual notice that the line extension tariff applied to them. Since the tariff was not assessed until after the date the Developers received such notice, the contracts were unenforceable when the tariff was applied. Thus, application of the tariff to the Developers' property did not impair a valid contract.

■■■ Moreover, even if the contracts had been enforceable at the time the new tariffs were applied, contracts with public utilities are subject to reserve authority of the state, under the police power, to modify contracts in the interest of public welfare. *Midland Realty Co. v. Kansas City Power and Light Co.*, 300 U.S. 109, 57 S.Ct. 345, 81 L.Ed. 540 (1937); *Exxon Corp. v. Egarton*, 462 U.S. 176, 192–93, 103 S.Ct. 2296,

---

**13.** We reject the Developers' suggestion that they relied upon the contracts when determining how to subdivide their property and, consequently, that they will suffer damages if the revised tariff is applied to lots sold after they received notice. There is no evidence in the record that they would have developed the property differently had they known that the line installation policy was subject to revision. In addition, the new tariff is applicable to all other lots in HEA's service area. Other property owners were also unlikely to have anticipated a significant change in the cost of installing electrical service to their property. Therefore, with respect to property sold after they received notice that the tariff affected them, the Developers are in the same position as their competitors.

**14.** U.S. Const. art. I § 10, cl. 1; *accord* Alaska Const. art. I, § 15 ("[N]o law impairing the obligation of contracts ... shall be passed.")

**15.** The Developers also assert that their due process rights to notice and an opportunity to be heard were violated. We reject this argument. The Developers did in fact receive actual notice and an opportunity to be heard before the tariff was applied to their property. As to the validity of the tariff revision itself, HEA satisfied the statutory notice requirements and the Developers had no right to actual notice of the tariff revision.

76 L.Ed.2d 497 (1983).[16] Therefore, the contract clause does not preclude application of the revised tariff to the Developers' property.

## IV. ATTORNEY'S FEES

The superior court awarded actual attorney's fees and costs to the Developers for the appellate proceedings. This award was appealed by both sides. The Developers claim that their award should also have included attorney's fees for the proceedings before the PUC.[17] They assert that the superior court erred in upholding the PUC's determination that it lacked authority to award attorney's fees. Alternatively, they suggest that the superior court had authority to award attorney's fees for prior administrative proceedings and abused its discretion by failing to do so. HEA argues that the superior court abused its discretion by awarding actual attorney's fees for the appellate proceedings.

■ We find that the PUC correctly concluded that it lacked authority to grant the Developers attorney's fees. Although 3 AAC 48.115, grants the PUC authority to award reasonable attorney's fees in certain cases, the PUC's administrative power is essentially regulatory.[18] *Greater Anchorage Area Borough v. City of Anchorage*, 504 P.2d 1027, 1033 (Alaska 1972), *overruled on other grounds, City & Borough of Juneau v. Thibodeau*, 595 P.2d 626 (Alaska 1979). We conclude that the PUC does not have authority to award attorney's fees and costs in the absence of specific authorization.

■ We also affirm the superior court's refusal to award attorney's fees for the administrative proceedings. We recently held that, under Appellate Rule 508(e), attorney's fee awards, "should ... be limited to attorney's fees incurred in court, not those incurred in a prior administrative proceeding." *Kenai Peninsula Borough v. Cook Inlet Region Inc.*, 807 P.2d 487, 501 (Alaska 1991) (citations omitted). There is no reason to conclude that proceedings before the PUC should be excepted from the general principle that the court may not award attorney's fees for prior administrative proceedings.

■ As to the trial court's award of actual attorney's fees to the Developers for the appellate proceedings, we stated in *Kenai Peninsula Borough* that an award of attorney's fees under Appellate Rule 508(e) "should only partially compensate the prevailing party for attorney's fees" but that "[a]ctual costs and attorney's fees may be awarded where authorized by statute ... [or] to a successful appellee where the court finds that the appeal is frivolous or has been brought simply for the purposes of delay." 807 P.2d at 501; *see also State of Alaska, PERB v. Cacioppo*, 813 P.2d 679, 685 (Alaska 1991). Thus, in the absence of statutory authorization or a finding of frivolousness or undue delay, only partial attorney's fees may be awarded. Accordingly, we find that it was an abuse of discretion to award actual attorney's fees to the Developers. We remand this case to the superior court for reconsideration of the attorney's fee award in light of this opinion.

REVERSED in part, AFFIRMED in part, and REMANDED.

---

16. The regulations pertaining to special contracts reflect this principle. For example, 3 AAC 48.390(a) requires special contracts filed with the PUC to contain an explicit statement that they are modifiable.

17. We need not address the Developers' argument that they are entitled to attorney's fees pursuant to 42 U.S.C. § 1988 because we have found no due process violation. *See Maine v. Triboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

18. 3 AAC 48.390(a) grants the PUC authority to award attorney's fees in cases involving the Public Utility Regulatory Policies Act, 16 U.S.C. § 2601 et seq. (1988).