**Maynard JOHNSON, Appellant,**

v.

**D. Charlene DORIS, personal representative of the estate of Clifford M. Johnson, Appellee.**

No. S–6474.

Supreme Court of Alaska.

March 14, 1997.

Hugh G. Wade and Terry J. King, Wade & DeYoung, Anchorage, for Appellant.

Robert L. Manley, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for Appellee.

Before COMPTON, C.J., and RABINOWITZ, EASTAUGH, JJ., and SHORTELL, J. Pro Tem.*

*OPINION*

EASTAUGH, Justice.

I. *INTRODUCTION*

We must decide here whether it was error to deny Maynard Johnson's Civil Rule 60(b) motion to set aside a probate order approving a final accounting and distribution. Johnson alleged, after the probate order was entered, that excessive professional fees and

---

**5.** Distributel makes several other arguments. They are without merit and need not be addressed.

\* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

costs were incurred during administration of the estate. We reverse and remand for further proceedings.

## II. *FACTS AND PROCEEDINGS*

Clifford M. Johnson died in 1983. His will provided that the residue of his estate would be distributed to his natural son, Maynard Johnson. The will named decedent's sister, Evva Betts, executrix. The superior court admitted the will to informal probate and appointed Betts personal representative. Maynard Johnson became co-personal representative in June 1984.

The estate was valued at $682,798 in 1984. Claims against the estate totaled $228,419, including a $96,322 claim by Humana Hospital Alaska, Inc. At Humana's request, the personal representative was required to post a $200,000 bond. Safeco Insurance Company of America issued the bond.

In May 1986 Humana filed a motion to remove Betts and Johnson as co-personal representatives. On May 30 the court removed Betts and Johnson and appointed the Public Administrator, D. Charlene Doris, the successor personal representative.[1] At the request of the successor personal representative, the law firm of Hughes, Thorsness, Gantz, Powell & Brundin (Hughes, Thorsness) was engaged to assist in administering the estate.

 On October 29, 1992, the personal representative filed a Petition for Settlement and Distribution and Approval of Final Account (the petition). Attached as Exhibit "A" to the petition was a "Final Accounting" which listed professional fees and expenses. The net value of the estate was then approximately $90,821. The personal representative also gave notice that the probate master would hear the petition on November 18.[2] Johnson was served with the petition, Exhibit "A," and the notice.

Johnson had met with Hughes, Thorsness attorney Robert Manley on several occasions. They met in October 1992 to discuss the estate. Johnson asserted that he had then asked Manley whether he should attend the November 18 hearing, and was told that "[Johnson] could attend the final accounting hearing if [he] wanted to but did not have to." They met again on November 13. Manley then informed Johnson that Safeco had a default judgment against Johnson, as a result of an award of litigation costs and fees while Johnson was co-personal representative. The default judgment was in the amount of $14,185. Although Johnson had received a copy of the complaint from Safeco in December 1989, he had understood Safeco was taking no further action against him because "they knew [he] did not have any property." He "thought that the lawsuit had been dropped." Johnson affied that he had no knowledge of the judgment until Manley informed him on November 13, 1992, that Safeco was attempting to execute upon the judgment against Johnson's inheritance. According to Johnson, Manley suggested that Johnson get a lawyer to "look at" the default judgment. Manley repeated this suggestion in a letter of November 16.

On November 17, Johnson telephoned attorney James Hill, a Wade & DeYoung associate, and made an appointment with him for November 18. Hill affied that at the November 18 meeting,

> Maynard told me that his father had died and left property to him. He said a hearing had been held earlier that day to close his father's estate.... He said that Robert Manley, the attorney for his father's estate[,] had "helped" him with the Safeco claim and had told him to go get an attorney to help him defend against the default judgment.... He retained me to set aside the Default Judgment or negotiate a settlement....

---

1. The Public Administrator is employed by the Alaska Court System. *See* AS 22.15.310–.340.

2. Johnson objects to the adequacy of this notice. He claims it did not conform to Alaska Probate Rule 12(b) because it did not expressly state that objections must be raised at or before the hearing or be waived. Although Johnson's allega-

tions may have merit, we do not address this issue here. "[A]n appeal from an order denying relief from judgment under Rule 60(b) does not bring up the underlying judgment for review." *McCracken v. Davis,* 560 P.2d 771, 776 (Alaska 1977); *see also Wellmix, Inc. v. City of Anchorage,* 471 P.2d 408, 411 (Alaska 1970).

Johnson did not attend the November 18 hearing. No one objected to the petition or the final accounting at the hearing. Safeco, however, moved to exonerate its bond and asked that the estate closing be delayed until the exoneration issue was resolved. The probate master accordingly scheduled a hearing for December 11, 1992.

On November 19 Johnson called Hill and told him that "an estate hearing was being held on December 11, 1992." On December 11 Hill filed an entry of appearance for Johnson and moved to stay distribution of the estate proceeds pending resolution of a Civil Rule 60(b) motion to set aside Safeco's default judgment. Hill affied that the December 11 hearing was concerned solely with determining how long to extend the bond past estate closure. He affied that "[t]he final accounting was not discussed to the best of my recollection and according to the log notes and tape of the hearing." On December 22, 1992, Hill left Alaska for Christmas vacation and did not return until about January 4, 1993.

On December 28 Safeco and Johnson stipulated that a portion of Johnson's share of the estate proceeds sufficient to satisfy Safeco's judgment would be deposited in the court registry. On December 30 the probate master recommended that the court enter the proposed order approving the final account and decree of distribution.[3]

Late the afternoon of December 30, while Hill was absent from Alaska, Manley faxed to a Wade & DeYoung paralegal, Glen Earls, a proposed joint statement of nonobjection and a letter asking Earls to have Hill approve signature of the joint statement. The letter also stated:

If we can get the Superior Court to sign the Order Approving Final Account and Decree of Distribution this will enhance our position [sic] the estate is fully closed out in calendar 1992. This in turn will provide Maynard Johnson with a significant individual income tax deduction which will be lost if we are not able to establish

that the estate was closed except for ministerial acts prior to the end of the year.

The proposed joint statement announced the parties' nonobjection to the master's report (concerning exoneration of Safeco's bond) and the master's recommendation that the court enter the order approving the final account and decree of distribution; the statement also asked the court "to immediately adopt" the proposed order. Although the letter discussed the proposed order, the fax transmittal did not contain a copy of the order. Manley faxed Earls a copy of the order the next day. Except for reference to Ashburn & Mason's relatively modest fees ($12,259.92), the order said nothing about the very large professional expenses incurred. The order stated that it "allowed and settled the Final Account," but did not attach the final accounting filed with the court on October 29. Earls affied that "[i]n telephone conference and in the letter Mr. Manley indicated that the stipulated order had to be signed immediately in order to get it before the Judge on that New Year's Eve day."

On December 31, Hill's office telephoned him to advise him of the December 30 request for a stipulation to close the estate on December 31. Hill affied:

As I recall, I told Ms. Hartke [a Wade & DeYoung attorney] that we were representing the client in a collection matter, that the closing hearing had been held, that Mr. Johnson had no objections to closing the estate and was just waiting for his check to come and that only the formalities of the actual closing remained. I believe we discussed the Master's Report of December 30, 1992, and I said there was no reason to object to the report.

As Manley requested, on December 31 Hill's firm signed the stipulation for Johnson in Hill's absence. The joint statement of nonobjection was also signed by counsel for the personal representative and Safeco, and was filed with the court on December 31. On December 31 the superior court signed the

---

**3.** On December 30 the probate master also reduced the bond to $100,000 and recommended that it be exonerated if no creditor claims against the estate were pending 180 days after entry of an order approving the final account and decree of distribution. On September 27, 1993, the court ordered the bond exonerated.

Order Approving Final Account and Decree of Distribution.

In February 1993 the personal representative completed the estate disbursements, paying $2,412 to Johnson and $18,723 to Safeco to satisfy its judgment against Johnson. On March 8 the personal representative filed an accounting for the period of August 1992 through February 1993.

On March 10 Hill reviewed documents received from Safeco concerning the default judgment, and informed Johnson that the amount of professional expenses charged in administering the estate may have been excessive. Johnson asked Hill to investigate the amount of the professional expenses.

The professional expenses included $53,396 in accountant's fees and $199,611 in attorney's fees and costs.[4] Hill requested copies of Manley's billing invoices, but when he was informed that the copies would cost about $300, he arranged to review the invoices at the offices of Hughes, Thorsness. That review took place May 21. Hill later affied that the billings described the work done but did not state the hours spent.[5]

On November 3, 1993, Johnson filed a Civil Rule 60(b)(1) motion to set aside the December 31 order approving the final account and decree of distribution and to set a hearing to review the estate's professional fees. The motion cited grounds of "excusable neglect, inadvertence or mistake because justice demands it." Johnson claimed that the estate could have been closed between July 1986 and August 1989, when the accrued payments on the sale of estate property would have allowed the estate to pay off its liabilities. Johnson asserted that between June 1986 and March 1993 the estate instead had incurred about $255,475 in legal fees and costs and accounting fees. He claimed professional fees and costs had consumed eighty-five percent of the "net estate."

After conducting a hearing, the probate master issued a report recommending that Johnson's Rule 60(b) motion be denied. The grounds cited by the master are discussed below. Johnson objected to the report. The superior court adopted the master's report and denied Johnson's motion to set aside the December 31 order and Johnson's request for a hearing on attorney's fees. The court denied Johnson's motion for reconsideration. Johnson appeals.

## III. DISCUSSION

### A. Standard of Review

■ ■ We review a denial of a Civil Rule 60(b) motion for abuse of discretion. *Gravel v. Alaskan Village, Inc.,* 423 P.2d 273, 277 (Alaska 1967). We will not find an abuse of discretion unless we are left with a definite and firm conviction on the whole record that a mistake has been made. *Id.*

### B. Civil Rule 60(b)

Johnson argues that the final order should be set aside under Civil Rule 60(b)(1) and (b)(6).[6] He claims that he should be granted

---

**4.** The gross value of the estate as stated in the final accounting was approximately $438,571. Expenses and debts charged to the estate totaled $347,750, including approximately $253,007 in professional fees and costs. The professional expenses included $53,396 for accountant's services, legal fees of $155,560 incurred by Hughes, Thorsness and $12,260 incurred by Ashburn & Mason (which represented Betts and Johnson as co-personal representatives), and law firm expenses of $11,791. The professional expenses also included estimated attorney's fees and costs of $20,000 to close the estate. The net value of the estate was then approximately $90,821.

**5.** Hill stated in an affidavit:

> On May 21, 1993, I went to Hughes, Thorsness law offices and reviewed the billing invoices for the estate. I requested copies. The copies cost $78.50. In June, 1993, I reviewed

the billings. The billings included only descriptions of work done and amounts due with no statement of hours. After reviewing the fees I felt that the services rendered were not necessary to the estate and that the estate could have been closed long before it was.

**6.** Johnson also argues that the final accounting should be set aside so that the amount of attorney's fees can be reviewed. Johnson argues that he is not "ask[ing] the court to set aside an order arrived at through judicial deliberation and adversarial debate, but, instead, merely asks the Court to reopen an estate accounting for review that was not previously reviewed by the Court."

We have held that "[a] final order of a probate court is only effective as to matters that have been adjudicated; a final accounting may be set aside in order to adjudicate an unsettled portion of the administration of the estate." *Vance v.*

relief because he did not realize the significance of the professional fees and costs. He does not allege that he was personally ignorant of the amount of the expenses.

Rule 60(b) provides in part:

(b) *Mistakes—Inadvertence—Excusable Neglect—Newly Discovered Evidence—Fraud—Etc.* On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise or excusable neglect;

. . . .

(6) any other reason justifying relief from the operation of the judgment.

Alaska R. Civ. P. 60(b)(1), (6).

Johnson sought relief under Rule 60(b), arguing that his "failure to object is excusable neglect arising from his lack of familiarity with the rules and ways of the legal world." He claimed that

[he] has lived all but two years of his forty-three years in the Alaskan bush and worked as a fisherman, laborer, or mechanic. He has no prior experience with the probate system. He had no idea what an estate's attorney fees should have been. He just "thought that was the way things worked."

... Given [his] lack of sophistication in these matters, he did not object [to the fees] because he did not understand that there was a reason to object. He simply thought that the fee amounts were "all normal" in the Court system.

Johnson asserted that his "failure to raise an objection to the fee amount was clearly a mistake or inadvertence on his part, as any reasonably prudent person who was adequately informed would have surely objected to the amount of the fees."

It appears from the record before us that the master and the superior court approved the professional fees and costs without first conducting any inquiry at all into the justification for those expenses. The personal representative's final accounting did not adequately support these expenses. No showing was made that particular services were needed; no showing was made as to the number of hours spent. We note that the probate master should have been alerted by the amount of the professional expenses relative to the size of the estate, and should have given substantive consideration to the proposed fees and costs. Under AS 13.16.440, the court may review the reasonableness of the compensation of the personal representative or of an employee of the estate. *Cf. In re Estate of Ridl,* 455 N.W.2d 188, 192 (N.D. 1990) ("[A] court sitting in its probate capacity has jurisdiction to take necessary action to preserve the assets of the estate for the ultimate beneficiaries."); *In the Matter of Estate of Quinn,* 830 P.2d 282 (Utah App. 1992) (reviewing the reasonableness of attorney's fees).

Although the fees charged seem very large at first glance, the appellate record does not establish as a matter of law that they are excessive. The issue of whether the fees were excessive is hotly disputed by the parties. The personal representative argues on appeal:

Maynard Johnson left his father's estate in absolute shambles. The estate was complex in that it involved multifaceted problems involving creditors, unproven townsite trustee land applications, sale of a liquor license and related facilities, numerous small claims actions and substantial accounting, income tax and estate tax difficulties.

D. Charlene Doris, public administrator acting as personal representative appointed by the court, has straightened out all of the difficulties and saved Maynard Johnson from being sued to collect on behalf of creditors cheated by his deficient administration, [yet] Maynard Johnson now complains about the significant costs of cleaning the nest which he fouled. The absolutely [sic] value of an estate and the

*Myers' Estate,* 494 P.2d 816, 820 (Alaska 1972). However, the professional fees at issue here were included in the final accounting which was reviewed before the estate was closed. Although

no objection to the fees was raised at the time, they are considered adjudicated for purposes of this appeal. Therefore, we do not review the issue of professional fees. *See supra* note 2.

size of distributions to beneficiaries do not reflect, nor does it serve as a proper measure for the attorney's fees reasonably incurred in the process of administration.

Johnson argues that the estate could have been settled in 1989, and that all fees subsequently incurred were inappropriate. Johnson also disputes the personal representative's claim that the estate was in turmoil, and that it took extreme efforts to straighten it out and settle all claims without reducing the estate to insolvency. Johnson also disputes the personal representative's claim that Johnson was responsible for much of the confusion when she took over as successor personal representative in 1986. He claims that he "is ... unsophisticated [and] ... may have been somewhat overwhelmed by the formal requirements of estate administration but his efforts to administer the estate were productive, and there is no evidence in the record that he engaged in any misconduct, or that any of his acts or omissions prejudiced the estate or its creditors."

■ We need not now decide whether the fees and costs were excessive. The question here is whether it was error to deny Rule 60(b) relief without conducting a hearing.

The probate master found Johnson's "claim of excusable neglect and inadvertence on his part to be incredible." The master supported this conclusion with findings that Johnson was actively involved in the administration of the estate until 1986; that Johnson discussed the hearing and the proposed distribution with Manley before the hearing was held; and that counsel represented Johnson when the final order was entered and appeared at subsequent court hearings. The master also noted that Johnson filed no objection to the final accounting, signed the joint statement of nonobjection, and signed a receipt upon receiving estate assets pursuant to the final order. The superior court adopted the probate master's report.

Thus, denial of Civil Rule 60(b) relief was based on three main circumstances: (1) Johnson's involvement in the administration of the estate until 1986; (2) Johnson's discussions with Manley; and (3) Johnson's representation by counsel.

We find these circumstances, and the other facts mentioned by the master, insufficient to deny Johnson an opportunity to have judicial review of the professional expenses.

### 1. *Johnson's prior experience*

We first reject the theory that Johnson's prior experience in administering the estate should have caused him to question these expenses. That theory conflicts with reasons advanced when the same attorneys now representing the personal representative sought, on behalf of Humana, to have Betts and Johnson removed as co-personal representatives in 1986. It also conflicts with the personal representative's present arguments regarding the inadequate administration of the estate when Johnson was a personal representative.[7]

The master's report points to no evidence tending to show that Johnson's experience as co-personal representative improved his knowledge of the administration of estates. Indeed, his record as administrator tends to confirm the lack of knowledge and comprehension of the probate system which Johnson claims led to his failure to object to the expenses in the first place. We note that the personal representative's appeal brief does not attempt to defend the superior court's decision on the theory Johnson's prior experience should have alerted him that the expenses were objectionably large. The brief instead focuses on the fact that Johnson was at times represented by counsel.

> The evidence before the court presents [a] picture not so much of misfeasance in office but rather nonfeasance. The personal representatives have not undertaken the steps necessary to expeditiously administer this estate. The estate has [been open] for more than two and a half years. The necessary estate tax and income tax returns have not been filed. The creditors have not been paid. No significant assets of the estate appear to have [been] sold.

---

7. The personal representative argues on appeal: "[a]dministration of the estate did not proceed well" when Johnson was a co-personal representative. Johnson and his co-personal representative apparently failed to file tax returns, failed to obtain authority to continue the decedent's business, failed to dispose of assets and failed to pay creditors. The memorandum supporting the motion to remove Betts and Johnson argued:

It appears that Johnson's failings as administrator point towards exactly the kind of ignorance he claims to have had regarding the professional expenses. The record does not support the conclusion that Johnson's prior experience should have caused him to understand whether he should attend the November hearing, object to the expenses, or hire an attorney to review the expenses.

### 2. *Johnson's communications with Manley*

We also conclude that it was incorrect to find that Johnson's communications with Manley should have alerted Johnson.

Johnson affied: "I did not have a lawyer represent me during the probate of my father's estate. I trusted in the public administrator's attorneys. I never had any question about their work because I always thought they were doing what they were supposed to do."

Johnson recalled meeting with Manley in October 1992. He relates the following:

I met with Mr. Manley and we went over the numbers in a court document and he told me what everything was costing the estate. I thought the numbers were all normal because I had never been in a probate before. I asked Mr. Manley if I should go to the hearing on the costs of the estate and he told me that I could attend the final accounting hearing if I wanted to but did not have to.

Johnson spoke with Manley again after discovering that Safeco intended to collect a default judgment against him. Manley told Johnson to get an attorney to look at that problem.

The master characterized Manley's November 16 letter as "advising [Johnson] again about the upcoming hearing and urging him to hire a lawyer which he did." In relevant part, that letter states:

As you know the hearing is set for November 18, 1992. . . . You are certainly welcome to attend, but there is no legal requirement that you do so. . . . I want to emphasize (as we discussed in our recent telephone conversation) that we do not represent you in this or in any other mat-

ter. Accordingly, it is imperative that you engage other counsel to represent you personally. *An attorney working for you may be able to set the judgment aside or negotiate a satisfactory settlement with Safeco.*

(Emphasis added.)

Alaska Rule of Professional Conduct 4.3 provides:

In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding.

The comment to the rule elaborates:

An unrepresented person, particularly one not experienced in dealing with legal matters, might assume that a lawyer is disinterested in loyalties or is a disinterested authority on the law even when the lawyer represents a client.

It is debatable whether Johnson received adequate warning of the potential need for counsel. Manley's admonition that Johnson seek counsel specifically referred to Safeco's claim. It would have been reasonable for Johnson to assume that it was his dispute with Safeco that triggered Manley's suggestion. In the absence of an express and unqualified suggestion that Johnson retain counsel or attend the hearing, it was not unreasonable for Johnson to refrain from doing either of those things. Therefore, it is not surprising that when the attorney Johnson claims he trusted told him he did not have to attend the hearing, he did not. Nor is it surprising that when no one else questioned the professional expenses, Johnson did not object, either.

Johnson's October meeting with Manley to review the figures was not sufficient. If Johnson did not understand that the fees were objectionably high, it is not determinative that Manley told him what the numbers were. Johnson plausibly claims he did not realize he could or should object to those numbers.

### 3. *Johnson's representation by counsel*

The third main reason given for denying Johnson's motion was his representation by counsel. It is irrelevant to the 1992 closing order and Johnson's 1993 motion for relief that counsel had represented him until he was removed as co-personal representative in 1986. Of more potential significance was Johnson's retention of counsel before entry of the December 31, 1992, closing order. The circumstances of Hill's retention and the execution of the December 31 stipulation and order are discussed in detail above.

Johnson moved for Rule 60(b) relief in November 1993. Thus, the question is whether Johnson's attorneys should have investigated the final accounting before signing the stipulation on December 31, 1992, and taken the chance Johnson would lose the year-end deduction that gave rise to the urgency in closing the estate. Under the circumstances it is understandable why Hill's firm signed the stipulation on December 31: Hill reasonably believed that he was retained specifically to deal with the Safeco default judgment,[8] and that the only real issue in closing the estate was Safeco's intention to reduce Johnson's inheritance; Hill believed the final accounting issue had already been resolved at the November 18 hearing; Hill knew the December 11 hearing had dealt only with the exoneration of Safeco's bond; Hill was pressed at the last minute to approve the stipulation and final closing report, which in itself did not mention any professional fees paid to Hughes, Thorsness; and

Hill was told his client stood to lose a valuable deduction if the estate were not closed by the end of the year.

In conjunction, these factors render reasonable the actions of Hill that led to entry of the December 31 final order.[9] We conclude that Johnson made out a case for relief pursuant to Civil Rule 60(b)(1). We hold that the superior court abused its discretion in failing to reopen the proceedings for the purpose of determining, pursuant to AS 13.16.440, the reasonableness of the professional expenses incurred during the administration of the estate.[10]

## IV. CONCLUSION

We REVERSE the superior court's denial of Johnson's Rule 60(b)(1) motion to set aside the final probate judgment, and REMAND for further proceedings.

MATTHEWS, J., not participating.

---

8. Johnson claimed that he was not represented by counsel for purposes of the estate when the estate was closed. Johnson retained counsel who appeared for him on December 11, 1992, but he contends that this representation was limited to resolving Safeco's default judgment claim against him. On December 28 Johnson stipulated that a portion of his share of the proceeds from the estate sufficient to satisfy Safeco's judgment would be deposited in the court registry. Johnson claimed it was not until March 1993, when Hill reviewed documents sent by Safeco in relation to the default judgment and suggested to Johnson that the fees involved in the administration of the estate might be excessive, that Johnson retained counsel to represent him in matters of the estate.

9. Given our conclusion that Hill's actions were reasonable, we need not decide whether a mis-

take of counsel would relieve a beneficiary. We have held that a mistake based on the asserted failure of counsel to adequately represent his client is generally not an excuse for purposes of Rule 60(b)(1). *Hartland v. Hartland*, 777 P.2d 636, 644–45 (Alaska 1989) (denying relief); *Farrell v. Dome Labs.*, 650 P.2d 380, 384 (Alaska 1982) ("An exception to this general rule is recognized, however, where the failure to provide relief would result in an injustice." (footnote omitted)).

10. Given our conclusion that Johnson was entitled to relief under Civil Rule 60(b)(1), we need not consider whether Civil Rule 60(b)(6) also applies. *See Village of Chefornak v. Hooper Bay Constr. Co.*, 758 P.2d 1266, 1270 (Alaska 1988). We also note that although Johnson cites Rule 60(b)(6) on appeal, he relied exclusively on Rule 60(b)(1) in the superior court.