Russell SNOOK, Jr., Appellant,

v.

Wayne and Sheree BOWERS, Appellees.

In re the Heirs of James
Snook, Deceased.

Nos. S–8463, S–8464.

Supreme Court of Alaska.

Nov. 9, 2000.

774

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

In these consolidated appeals, Russell Snook, Jr. challenges two decisions of the superior court. First, Snook appeals Judge Michael Thompson's grant of summary judgment to Wayne and Sheree Bowers. Judge Thompson decided that the Bowerses are the sole owners of a piece of property originally owned by the Shaan–Seet Native corporation and claimed by Snook. Second, Snook challenges Judge Thomas Jahnke's denial of his motion for relief from a stipulated judgment regarding ownership of the parcel. We affirm the decisions of both courts.

## II. FACTS AND PROCEEDINGS

The piece of property at issue is located in Craig and is referred to as "Lot 82, as recorded on the Plat of Port St. Nicholas Subdivision." Before 1984, Lot 82 belonged to Shaan–Seet, Inc., an Alaska Native corporation. In 1984 Shaan–Seet conveyed Lot 82 to "the heirs and devisees of James Snook, who died October 23, 1973." James Snook had two sisters, Mary Snook Lauth and Edith Snook Hanson; the former had affied in 1974 that she and her sister were James Snook's only heirs. Based apparently on this affidavit, Shaan–Seet wrote to Edith Hanson's son, Peter Hanson and Lauth's daughter, Marilyn Baumann in 1985 that they were the owners of Lot 82 (both Edith Hanson and Lauth had died; Peter Hanson had affied that he was Edith's only heir).

Some time before January 29, 1988, Peter Hanson expressed to Shaan–Seet an interest in selling the lot. Later that year, Wayne and Sheree Bowers informed Shaan–Seet of their desire to purchase a lot in the subdivision. Shaan–Seet, knowing that Baumann was interested in selling Lot 82, apparently contacted either Baumann or Hanson, who then called the Bowerses in 1988 or 1989 and told them that the lot was for sale.

On March 16, 1989, Baumann (as well as her husband, Eugene Baumann) and Hanson

A. Fred Miller, Ketchikan, for Appellant.

Michael W. Holman, Holman & Schulz, Ketchikan, for Appellees.

entered into an agreement with the Bowerses regarding Lot 82. Pursuant to this agreement, Baumann and Hanson purported to sell "Lot # 82" to the Bowerses for $18,000—$1,000 in earnest money and $17,000 to be paid "on acceptance of title and delivery of deed or delivery of contract." Under the heading "further conditions," the agreement also provided that Baumann and Hanson, upon the Bowerses' payment of the earnest money, would "agree to allow the buyers to proceed with development of the land."

The Bowerses exercised their rights under this last clause immediately, moving their floathouse onto the property and building a driveway in March 1989. Wayne Bowers's uncontradicted testimony is that they "spent nearly $50,000 improving the property and converting the floathouse to a permanent structure."

Pursuant to the agreement—which called for conveyance of "good and sufficient deed free and clear of all liens and encumbrances"—a title insurance company was retained to insure Baumann and Hanson's title to Lot 82. The company issued a "commitment to insure" on March 30, 1989; however it noted that James Snook's "estate was never had" (presumably, this meant that the heirs were never determined) and therefore refused to insure against the rights of his heirs. Most significantly, the title company's investigation revealed that James Snook had a brother, Russell Snook, who predeceased him.

Six months later, Baumann and Hanson's attorney wrote to Shann–Seet, blaming it for the creation of this title cloud and requesting Shaan–Seet's position on the matter. Shaan–Seet then conducted its own investigation, which revealed that Lauth's "sworn affidavit that she and Mrs. Hanson were the sole heirs under Alaska law of James Snook ... was *not* correct" and that Peter Hanson's affidavit that he was Edith Hanson's sole heir was likewise incorrect. Therefore, because James Snook's heirs—including Russell, who predeceased him—and Edith Hanson's heirs were entitled by Alaska intestacy law to a share of their respective estates by right of representation,[1] "the Lot 82 deed

should have been issued to ... numerous persons other than just Marilyn Baumann and Peter Hanson. Thus, Shaan–Seet is simply not in a position to give clear title to Lot 82 in favor of just Marilyn Baumann and Peter Hanson."

In an effort to resolve the matter, Shaan–Seet filed an interpleader complaint captioned "In re the Heirs of James Snook" in September 1992. All of the potential heirs were made parties, including Russell Snook, Jr., Marilyn Baumann, and Peter Hanson. At the conclusion of the matter, a stipulation, drafted by Snook's counsel and signed by all of the parties, was entered. On the basis of the stipulation, Judge Jahnke signed a litigation-ending order. The stipulation set out in exacting detail the relevant family history and the ownership rights of each of James Snook's successors in Lot 82. It provided that Baumann and Hanson each owned an undivided one-third share and that Snook owned an undivided one-twelfth share. The Bowerses were never made parties to this action. On August 28, 1997, Snook filed a motion for a *nunc pro tunc* order to amend the stipulation. Judge Jahnke denied the motion. Snook appealed.

Snook had gotten wind of the Bowerses' possession and development of Lot 82 in 1989, when Baumann told him that she planned to sell it to the Bowerses and to let them move onto the property. On November 12, 1996, he filed a complaint against the Bowerses seeking, among other things, to cancel the agreement between Baumann/Hanson and the Bowerses and to have himself adjudged owner of Lot 82 (Snook had purchased the remaining heirs' interests in Lot 82).

Both parties moved for summary judgment. The trial court granted summary judgment to the Bowerses, and ruled that they were the sole owners of Lot 82. Snook appealed.

### III. *STANDARDS OF REVIEW*

#### A. *Motion for Relief from Judgment (Nunc Pro Tunc)*

■ Judge Jahnke treated Snook's *nunc pro tunc* motion as a motion for relief from

---

1. *See* former AS 13.11.015.

judgment under Alaska Rule of Civil Procedure 60(b). We review a denial of a Rule 60(b) motion for abuse of discretion.[2]

### B. *Grant of Motion for Summary Judgment*

■ We review a grant of summary judgment using our independent judgment [3]:

> The court must determine whether any genuine issue of material fact exists and whether the moving party is entitled to judgment on the law applicable to the established facts. All reasonable inferences of fact from proffered materials must be drawn against the moving party and in favor of the nonmoving party. In reviewing an order of summary judgment, this court must reverse the order if the pleadings and evidence presented reveal either the existence of any genuine issues of material fact or that the moving party is not entitled to summary judgment as a matter of law.[4]

## IV. DISCUSSION

### A. *The Trial Court Correctly Denied Snook's Rule 60(b) Motion.*

■ Snook argues that the trial court improperly denied his motion to correct the 1995 stipulation *"nunc pro tunc."* He asserts that the court should have granted the motion pursuant to Civil Rule 60(b), which provides for relief from judgment. The rule provides several permissible circumstances under which such relief is allowed:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons:
>
> (1) mistake, inadvertence, surprise or excusable neglect;
>
> (2) newly discovered evidence which by due diligence could not have been dis-

covered in time to move for a new trial . . .;

(3) fraud . . .;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or

(6) any other reason justifying relief from the operation of the judgment.

Rule 60(b) further provides that "[t]he motion shall be made within a reasonable time, and for reasons (1), (2) and (3) not more than one year after the date of notice of the judgment." In this case, the judgment was entered on November 27, 1995 and mailed to counsel on November 29. Snook filed his *nunc pro tunc* motion on September 17, 1997. Thus, Snook did not move within one year of notice of the judgment.

Snook argues that his motion falls under reason (6), because "there exists [sic] 'extraordinary circumstances' " that justify relief. If this were so, the one-year time limit would not apply and Snook would merely have had to have brought his motion "within a reasonable time."

■ However, as the trial court pointed out, "clause (6) is to be employed only when grounds other than those specified in the preceding clauses (1) through (5) have been demonstrated." [5] Snook's motion was a quintessential clause (1)/(2) motion; he alleged that he "erroneously believ[ed]" that Baumann and Hanson each owned one-third of the property when his attorney signed the stipulation. Snook further states that he seeks to "correct the error" in the 1995 stipulation. This language places the basis for Snook's motion squarely under the categories of "mistake [or] inadvertence" (clause (1)) or "newly discovered evidence" (clause (2)). In short, Snook's claim that his motion is a

---

**2.** *See Johnson v. Doris,* 933 P.2d 1139, 1142 (Alaska 1997) (citing *Gravel v. Alaskan Village, Inc.,* 423 P.2d 273, 277 (Alaska 1967)).

**3.** *See Taranto v. North Slope Borough,* 909 P.2d 354, 355 (Alaska 1996).

**4.** *Id.* at 355–56 (citations and internal quotation marks omitted).

**5.** *Norman v. Nichiro Gyogyo Kaisha, Ltd.,* 761 P.2d 713, 715 (Alaska 1988).

clause (6) motion appears to be nothing more than an impermissible attempt to circumvent Rule 60(b)'s time limits.[6]  Judge Jahnke correctly denied Snook's motion.

**B.  The Trial Court Correctly Granted Summary Judgment in Favor of the Bowerses.**

**1.  Baumann's interest and Hanson's interest**

With one exception, the same analysis applies to Baumann's interest and Hanson's interest.  Therefore, the two are discussed together.

**a.  The trial court correctly decided that Snook was collaterally estopped from re-litigating issues that were part of the 1995 stipulation.**

▮ The trial court ruled that Snook was collaterally estopped from re-litigating whether and to what extent Marilyn Baumann and Peter Hanson owned interests in Lot 82.  The court based this ruling on the 1995 stipulation signed by, among others, Snook's counsel.  Snook argues that this was error.  We hold that the trial court's ruling in this regard was correct.

**(1)  The 1995 stipulation**

The parties to the stipulation empowered the court to "make and enter findings of fact and conclusions of law, as well as an order adjudicating the heirs at law of [James Snook] for the purposes of determining their respective interests in" Lot 82.  Further, the stipulation was to "constitute a full and complete settlement and compromise by all parties involved herein regarding all issues in-

volved herein."  Snook's counsel not only signed the stipulation, but drafted it as well.

**(2)  Purpose and elements of collateral estoppel**

▮ Collateral estoppel "bars a second suit between the same parties on the same subject matter resolving the same issues between the parties...."[7]  Its aim is to preclude relitigation of decided issues.[8]  We have laid out three elements that must be met for collateral estoppel to be applied against a party:

1.  The plea of collateral estoppel must be asserted against a party or one in privity with a party to the first action;

2.  The issue to be precluded from relitigation by operation of the doctrine must be identical to that decided in the first action;

3.  The issue in the first action must have been resolved by a final judgment on the merits.[9]

We have, at times, enunciated a fourth element:

4.  The determination of the issue must have been essential to the final judgment.[10]

▮ Snook does not dispute that the "party identity," "identity of issue," or "essential to the judgment" elements are satisfied here.  And he properly acknowledges that although cases which are resolved by settlement do not involve actual litigation, they can nonetheless have preclusive effects.  In such cases, "the judgment may be conclusive ... with respect to one or more issues, if the parties have entered an agreement manifesting such an intention."[11]

6.  See Village of Chefornak v. Hooper Bay Const. Co., 758 P.2d 1266, 1270 (Alaska 1988) ("Chefornak is entitled to 60(b)(6) relief only if the circumstances are 'extraordinary'; it cannot rely on Rule 60(b)(6) in order to circumvent the time limit if the circumstances actually amount to a 60(b)(1) claim.").

7.  State v. Baker, 393 P.2d 893, 896 (Alaska 1964) (citation omitted).

8.  See id. at 897.

9.  Borg–Warner v. Avco Corp., 850 P.2d 628, 634 (Alaska 1993) (citing Murray v. Feight, 741 P.2d 1148, 1153 (Alaska 1987)).

10.  See Johnson v. Alaska Dep't of Fish & Game, 836 P.2d 896, 906 (Alaska 1991) (citing Restatement (Second) of Judgments § 27 (1982)).

11.  Jackinsky v. Jackinsky, 894 P.2d 650, 655 (Alaska 1995) (quoting Restatement (Second) of Judgments § 27 cmt. e (1982)).

Snook asserts that the issue of Baumann's and Hanson's ownership of Lot 82 was not "litigated," and therefore not "resolved" for collateral estoppel purposes, because he never intended the agreement to determine his rights *vis-à-vis* Baumann and Hanson. Snook argues that

> [i]n entering the Stipulation and Order, Russell Snook's purpose and intent was only to determine his rights and entitlements with regard to the other heirs of Russell Snook, Sr., not the heirs of Mary Snook Lauth or Edith Snook Hanson.... This Stipulation and Order did not manifest an intent to resolve any of the issues presented by the present litigation.

However, the language of the settlement does not support Snook's argument. It is captioned "In re the heirs of *James* Snook," and provides that it was "adjudicating the heirs at law of [James Snook] for the purposes of determining their respective interests in ... Lot # 82." Further, the stipulation was to "constitute a full and complete settlement and compromise by all parties involved herein regarding all issues involved herein." Snook presents no evidence beyond the naked allegations quoted above that any of the parties intended otherwise. In short, whatever Snook's *post hoc* subjective understanding of what the agreement entailed, it explicitly manifested an intent to conclusively adjudicate the interests of all of James Snook's heirs to Lot 82, including Baumann and Hanson.

Therefore, the trial court correctly decided that collateral estoppel barred Snook from re-litigating Baumann and Hanson's ownership of Lot 82.

### b. *The Bowerses own Baumann's interest via her quitclaim.*

It is undisputed that Baumann validly quitclaimed her interest in Lot 82 to the Bowerses in November 1991. Because Snook is collaterally estopped from arguing otherwise, the trial court correctly ruled that this deed transferred a one-third undivided interest in Lot 82 to the Bowerses.

### c. *The earnest money agreement endowed the Bowerses with equitable title to Hanson's interest.*

Given the above, only one issue remains to be resolved regarding Hanson's interest in Lot 82. That is, did the earnest money agreement between Hanson and the Bowerses create equitable title in the Bowerses which was still valid at the time of trial? This issue is pertinent because, unlike Baumann, Hanson never actually deeded his interest to the Bowerses. To the contrary, Hanson quitclaimed his interest to Snook in December 1995.

The trial court granted summary judgment to the Bowerses on this issue because it found that Snook's "mere accusation that the agreement expired is not sufficient to show a genuine issue of material fact." Accordingly, the court ruled that the Bowerses "have equitable title to Hanson's one third interest in lot # 82 which will ripen into a legal title upon payment of the fair market value of this portion of lot # 82." In a later "memorandum to clarify order," the court specified that the Bowerses "have a right to Peter Hanson's or his assignee's ⅓ interest in lot # 82 upon payment of $6,000, ⅓ of the agreed upon purchase price of $18,000, plus interest at the legal rate."

Snook argues that this ruling was erroneous. First, he vigorously accuses the Bowerses of having "unclean hands," which would render a specific performance remedy improper. The Bowerses' hands are unclean, Snook asserts, because "[a]fter they signed the Earnest Money Receipt with Marilyn Baumann and Peter Hanson, they became aware that the other heirs of James Snook had an interest in the property." This argument is unpersuasive. The cleanliness or lack thereof of the Bowerses' hands *vis-à-vis* the "other heirs" to whom Snook refers—i.e., Russell Snook, Sr.'s successors in interest—has no bearing on the Bowerses' right to receive specific performance of *Hanson's* agreement to sell his interest to them. As Corbin has made clear, "The dirt upon [the party's] hands must be [the party's] bad conduct in the transaction complained of. If [the party] is not guilty of inequitable conduct toward the defendant in that transaction, [the party's] hands are as clean as the

court can require." [12]

Snook next argues that the Bowerses' "failure to pay either Marilyn Baumann or Peter Hanson for their interests or to get a deed from Peter Hanson shows that they did not believe that the Earnest Money Receipt was a valid agreement to the purchase of the Subject Property from Marilyn Baumann and Peter Hanson." However, after the Bowerses learned that Baumann's and Hanson's title to Lot 82 was clouded, it was reasonable for them not to make further payments to Baumann or Hanson until the matter was resolved. The Bowerses' failure to make these payments does not render the agreement invalid.

Finally, Snook argues that "granting of specific performance presumes the existence of a valid contract." This is surely true.[13] However, Snook offers no more than a naked allegation (both at trial and on appeal) that "the Earnest Money Receipt is of no force or effect." [14] Without any support, this does not suffice to raise any question about the validity of the contract or to suggest that the trial court erred in ordering Snook to convey Hanson's interest to the Bowerses.

It is well established law that prior purchasers like the Bowerses will gain equitable title to the land, enforceable against subsequent purchasers like Snook:

> Where a contract vendor of land violates his contract and conveys to a third party, the rights of the contract vendee to obtain title depend on the knowledge of the third party transferee. If the transferee took title in good faith without knowledge of the outstanding contract executed by his vendor, he may keep the land. But if he acquired title with notice, actual or constructive, the third party will be deemed a

constructive trustee for the contract vendee and may be required to convey the title to [the contract vendee] as the equitable and rightful owner under the outstanding contract of which the third party grantee had notice.[15]

Snook admitted that he knew of the agreement and the Bowerses' possession since 1989. Therefore, the trial court's decision to require Snook, on payment of the prorated share of the contract price, to convey Hanson's interest to the Bowerses was not an abuse of discretion.

2. *The trial court correctly decided that the Bowerses gained title to the remaining interest in Lot 82 by adverse possession under color of title.*

Finally, the trial court decided that the Bowerses had gained title to the remaining one-third interest in Lot 82—that portion which was originally owned by Russell Snook, Sr.'s successors in interest—by adverse possession under color of title. Snook argues that this decision was erroneous as well.

a. *Lot 82 was not exempt from adverse possession as Alaska Native Claims Settlement Act (ANCSA) land.*

As a preliminary matter, Snook argues that the Bowerses "cannot obtain the Subject Property through adverse possession because it is ANCSA land." He cites 43 U.S.C. § 1636(d)(1)(A) to support this contention.

This statute provides that "all land and interests in land conveyed in Alaska by the Federal Government pursuant to [ANCSA] to a Native individual or Native Corporation ... shall be exempt, so long as such land and interests are not developed or leased or sold to third parties[,] from ... adverse posses-

---

**12.** 5A Arthur Linton Corbin, *Corbin on Contracts* § 1168 n. 52 (1964) (quoting *Smith v. Neely,* 93 Ariz. 291, 380 P.2d 148 (1963) (internal quotation marks omitted)).

**13.** *See Hall v. Add–Ventures, Ltd.,* 695 P.2d 1081, 1087 (Alaska 1985).

**14.** In the context of his argument regarding adverse possession, Snook does expand on this statement in his reply brief. However, "where a

point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal." *Adamson v. University of Alaska,* 819 P.2d 886, 889 n. 3 (Alaska 1991) (citations omitted).

**15.** 11 Samuel Williston & Walter H.E. Jaeger, *A Treatise on the Law of Contracts* § 1418A (3d ed.1968).

sion." [16] It is not disputed that Lot 82 is "ANCSA land." However, Lot 82 was "developed" within the meaning of the statute, and therefore Snook's argument fails.

We dealt with the question of when ANCSA land is "developed" at length in *Kenai Peninsula Borough v. Cook Inlet Region, Inc.*[17] After examining the relevant statutory language and legislative history, we held that acts like those taken regarding Lot 82 amounted to "development":

> The definition of developed in [ANCSA] is broad enough to include subdivided land which is ready for sale. Subdividing is legally a purposeful modification of property, for it enables separate parts of the property to be sold. Similarly, as a sale of property is a use, a subdivision which suffices to permit sales effects a gainful and productive condition.[18]

Here, Lot 82 was part of a subdivision; Shaan–Seet recorded the Port St. Nicholas subdivision in 1983. Therefore, as of that date, Lot 82 was "developed" for ANCSA purposes and not exempt from adverse possession. The trial court's ruling on this score was accordingly free of error.

b. *The trial court correctly found that the Bowerses had color of title.*

The Bowerses first entered Lot 82 in March 1989. Snook filed his complaint on November 8, 1996.

The trial court found that the Bowerses possessed Lot 82 under color of title, and therefore decided this case under AS 09.45.052. That statute provides:

> The uninterrupted adverse notorious possession of real property under color and claim of title for seven years or more is conclusively presumed to give title to the property. . . .

A threshold question, then, is whether the court's finding that the Bowerses had color of title was erroneous.

■ Under Alaska law, three conditions must be met for an individual to establish color of title. First, the claimant must show the existence of "a written instrument which purports, but which may not be effective, to pass title to the claimant."[19] Second, the "supposed conveyance must accurately describe the land claimed."[20] Finally, "the good faith of the claimant is a prerequisite to the establishment of his [or her] claim under color of title."[21]

(1) *The Bowerses' executory land-sale contract was a written instrument purporting to convey title.*

■ The trial court found that the earnest money agreement between the Bowerses and Baumann/Hanson satisfied the first aspect of the color-of-title test. The court stated that the $1,000 earnest money paid by the Bowerses

> gave them equitable title to the property. Additionally the earnest money agreement allowed [the Bowerses] to move onto the property and begin making improvements[,] which they did immediately. These facts make it clear that the earnest money agreement here purported to pass title, at least equitable title, to the [Bowerses] who in response moved onto the property and began making investments in improving it.

Snook waited until his reply brief to argue that this aspect of the test was not met. He has by that failure waived the argument.[22] Therefore, the Bowerses meet the first element of the color-of-title test.

(2) *The instrument accurately described the land claimed.*

As the trial court noted, there is no dispute that this requirement has been met; the

**16.** 43 U.S.C. § 1636(d)(1)(A).

**17.** 807 P.2d 487 (Alaska 1991).

**18.** *Id.* at 498.

**19.** *Ayers v. Day and Night Fuel Co.,* 451 P.2d 579, 581 (Alaska 1969) (footnote and citation omitted).

**20.** *Hubbard v. Curtiss,* 684 P.2d 842, 847 (Alaska 1984) (citation omitted).

**21.** *Lott v. Muldoon Rd. Baptist Church, Inc.,* 466 P.2d 815, 818 (Alaska 1970) (citations omitted).

**22.** *See Hitt v. J.B. Coghill, Inc.,* 641 P.2d 211, 213 n. 4 (Alaska 1982).

earnest money agreement described the property, and neither party has ever challenged the accuracy of this description. Therefore, this element is met as well.

(3) *The Bowerses obtained color of title in good faith.*

■ Of the three elements, this is the most vigorously challenged by Snook. He argues that "[t]he Bowers[es] have not acted in good faith to establish their claim to the Subject Property. Almost immediately after they signed the Earnest Money Receipt with Marilyn Baumann and Peter Hanson, they became aware that the other heirs of James Snook had an interest in the property."

■ Snook's argument fails for a basic reason. The relevant time period for determining a claimant's good faith for color-of-title purposes is when the claimant *obtains* color of title. Since Snook does not dispute that the Bowerses acted in good faith when they (1) made the agreement with Baumann/Hanson, (2) paid the earnest money, and (3) entered into possession of Lot 82, his argument on this point is unavailing, as an examination of the relevant case law shows.

In *Lott,* we announced for the first time that "the good faith of the claimant is a prerequisite to the establishment of his claim under color of title."[23] However, because of the facts of that case, we declined to "pass upon the details of what constitutes good faith, nor do we have occasion to discuss exactly what would constitute bad faith under AS 09.25.050."[24] In a footnote, we added that "[i]n the present case, it must be noted that there has been no allegation made by appellant of fraud or bad faith on the part of Bernie Garland in *obtaining* color of title."[25] We thus established that the relevant time to examine a claimant's good faith was at the time he or she obtained title.

Fourteen years later, in *Ault v. State,*[26] we had occasion to apply the *Lott* good-faith requirement. There we held that "as to state adverse possession claims under color of title, we believe that good faith should be defined as an honest and reasonable belief in the validity of the title."[27] In so holding, we followed the lead of several jurisdictions which had "held that the claimant must have had an honest belief based on reasonable grounds that he had valid title to the land *when he entered it* in order to establish a good faith claim."[28]

The relevant time at which to examine the claimant's good faith under both *Lott* and *Ault* is when the claimant, state or private, obtained title to or took possession of the property, not throughout the period of possession.

Using this standard, the Bowerses possessed the requisite good faith. At trial, Snook's counsel himself conceded that "we don't dispute that the Bowers[es] moved on that property in good faith thinking that Baumann and Hanson were the owners." As Snook states in his brief, it was "*[a]fter* they signed the Earnest Money Receipt with Marilyn Baumann and Peter Hanson [that the Bowerses] became aware that the other heirs of James Snook had an interest in the property." (Emphasis added.)

Accordingly, the trial court correctly decided that the Bowerses met this part of the test, and that they had color of title to Lot 82.

#### c. *Elements of adverse possession*

■ This court has enunciated three requirements for adverse possession, elaborating on the three adjectives contained in AS 09.45.052: uninterrupted, adverse, and notorious.

These represent the three concepts underlying the law of adverse possession: (1) the possession must have been continuous and uninterrupted; (2) the possessor must have acted as if he [or she] were the owner and not merely one acting with the permission of the owner; and (3) the possession

---

**23.** *Lott,* 466 P.2d at 818 (citations omitted).

**24.** *Id.* (footnote omitted).

**25.** *Id.* at n. 10 (emphasis added).

**26.** 688 P.2d 951 (Alaska 1984).

**27.** *Id.* at 956.

**28.** *Id.* (emphasis added) (citations omitted).

must have been reasonably visible to the record owner.[29]

### (1) The Bowerses' possession was continuous and uninterrupted.

The Bowerses moved onto Lot 82 in March 1989. Their possession was uninterrupted until Snook filed his complaint in November 1996. Therefore, this element is met.

■ It might be argued that the litigation regarding Lot 82 should have tolled the statute of limitations, preventing it from running while litigation regarding title to the lot was pending (i.e., from September 1992—when Shaan–Seet filed its interpleader complaint—to November 1995—when the stipulation was entered). However, only "litigation *to which claimant is a party* suspends the running of limitations." [30] The Bowerses were never made parties to Shaan–Seet's interpleader action. Litigation must also involve the right to possession to toll the running of the statute,[31] which the Shaan–Seet interpleader did not; it dealt merely with the issue of ownership. Therefore, the running of the statute was not tolled during the litigation.[32]

### (2) The Bowerses acted as if they were the owners and not merely as if they were there with the permission of the owners.

■ It is undisputed that the Bowerses brought their floathouse onto the property and built a driveway. Snook himself vigorously asserted at trial, and asserts on appeal, that these improvements were made without his consent. These actions, coupled with

Snook's lack of consent, are "inconsistent with and hostile to" Snook's rights as the true owner.[33] Therefore, this element is satisfied.

### (a) Snook waived the issue of whether the Bowerses have met the requirements for adverse possession against cotenants.

■ Snook argues that the Bowerses "cannot claim ownership of the entire subject property through adverse possession because they have not met the necessary requirements to adversely possess against co-tenants." However, Snook argues this for the first time in his reply brief; this argument is accordingly waived.[34]

### (b) Assuming Snook did not waive the issue, Hanson and Baumann's conveyance to the Bowerses amounted to ouster of the remaining co-tenants.

■ Even assuming that Snook did not waive this argument, it is nonetheless unavailing. A large body of jurisprudence stands for the proposition that Snook and the other cotenants were ousted by the actions of Baumann, Hanson, and the Bowerses:

[A]n entry under a bond for title is a sufficient ouster of the cotenants of the grantor to set in motion the statute of limitations against them, although the purchaser does not acquire the legal title until long after entry, and that a purchaser may acquire title by adverse possession as against cotenants under an executory

**29.** *Alaska Nat'l Bank v. Linck,* 559 P.2d 1049, 1052 (Alaska 1977) (citing 7 R. Powell, *The Law of Real Property* ¶¶ 1013–15 (1968)).

**30.** 2 C.J.S. *Adverse Possession* § 153, at 869 (1972) (emphasis added).

**31.** *See id.; see also De Ridder's Unknown Heirs v. Belknap,* 312 Ky. 185, 226 S.W.2d 948, 948–49 (1950) ("[A]n unsuccessful action leading to no change of possession does not arrest the running of the statute of limitations.") (citation omitted).

**32.** *See also Welner v. Stearns,* 40 Utah 185, 120 P. 490, 495 (1911) ("It is not true that the commencement of an action, under all circumstances, arrests the running of the statute of

limitations. It is settled law that in case new parties are brought into a pending action as defendants the statute of limitations runs in their favor up to the time they are brought into the case.") (citation omitted).

**33.** *Linck,* 559 P.2d at 1053 n. 9 (quoting 3 *American Law of Property* § 15.4, at 772 (A.J.Casner, ed.) (1952)). Nothing in the record indicates that any of the other owners consented to the Bowerses' occupation of Lot 82 either.

**34.** *See Hitt v. J.B. Coghill, Inc.,* 641 P.2d 211, 213 n. 4 (Alaska 1982).

agreement by one cotenant to convey the whole.[35]

This rule of law rests on a basic premise of cotenancy, namely that one cotenant's conveyance of the whole estate to a third party who enters into possession amounts to ouster of the other cotenants:

> An ouster of cotenants of the grantor will ordinarily be presumed when the grantor conveys the entire property to a stranger who takes possession under the deed claiming sole ownership. In considering this question, the principle that one who enters on land is presumed to enter under the title that his deed purports on its face to convey, as respects both the extent of the land and the nature of his interest, is applied. Therefore, in such case, a sale of the whole tract is in effect such assertion of claim to the whole as to be incompatible with an admission that the other cotenant has any right whatever; and it follows that acts of ownership on the part of such grantee must necessarily be adverse to any other part owner, even in the absence of actual notice to the other cotenant of the adverse character of the possession.[36]

We agree with the vast majority of jurisdictions which have held that entry by a vendee under an executory land-sale contract from the owner of an undivided share purporting to convey the whole constitutes ouster of the cotenants. Such behavior by the cotenant and his or her vendee is entirely incompatible with the rights of the cotenants, and serves to oust them. Thus, the Bowerses successfully adversely possessed against Snook and the other contenants.

### (3) The Bowerses' possession was reasonably visible.

■ We have held that for a possession to be "notorious" it must be such that "if the owner visits the property, he would be put on notice and be able to assert his rights. The owner need not actually know about the presence of an adverse possessor; what a duly alert owner would have known the owner is charged with knowing."[37]

Here, Snook does not dispute that a duly alert owner would have noticed the presence of a floathouse and driveway on this parcel of land. In fact, Snook had actual notice of the Bowerses' possession from 1989. Accordingly, the trial court correctly found that this requirement was fulfilled and correctly ruled that the Bowerses had gained title to this

**35.** 3 Am.Jur.2d *Adverse Possession* § 239 (footnotes and citations omitted); *see also Schauble v. Schulz*, 137 F. 389, 395 (8th Cir.1905) ("It is now the generally accepted rule that the possession of a vendee who enters under an executory contract for the sale of land, and subsequently receives a conveyance in fulfillment thereof, is adverse from the time of entry to all the world except the vendor.") (citations omitted); *Welner*, 120 P. at 493 ("One entering under an executory contract of purchase may, and generally does, hold adversely as against all persons except his vendor.") (quoting 1 *Encyclopedia of Law and Practice* at 1049); *Simpson v. Sneclode*, 83 Wis. 201, 53 N.W. 499, 500 (1892) ("[W]here a contract is made for the sale of land upon the performance of certain conditions, and the purchaser enters into possession under the contract, his possession from the time of entry is adverse to all except the vendor ....") (citations and internal quotation marks omitted); *Avent v. Arrington*, 105 N.C. 377, 10 S.E. 991, 996 (1890) (same); *Lloyd v. Mills*, 68 W.Va. 241, 69 S.E. 1094, 1096 (1910) (same); *Ketchum v. Spurlock*, 34 W.Va. 597, 12 S.E. 832, 833 (1891) (same).

**36.** 3 Am.Jur.2d *Adverse Possession* § 236. *See also Hodgson v. Federal Oil & Devel. Co.*, 274 U.S. 15, 20, 47 S.Ct. 502, 71 L.Ed. 901 (1927) ("Such holding must be regarded as exclusive and hostile to all others and not in any relationship of trust and confidence [with the cotenants] ."); *McNeeley*, 44 S.E. at 515 ("[I]f one joint tenant convey the whole, and the grantee takes possession under [the grantor's] deed, claiming the whole, the conveyance is an ouster of the co-tenant, and the possession adverse to [the cotenant], and the statute runs against [the cotenant]."); *Bowers v. Rightsell*, 173 Ark. 788, 294 S.W. 21, 24 (1927) (same); *Unger v. Mooney*, 63 Cal. 586, 594 (Cal.1883) (same); *Morrison v. Byrd*, 72 So.2d 657, 658 (Fla.1954) (same); *Waterman Hall v. Waterman*, 220 Ill. 569, 77 N.E. 142, 143 (1906) (same); *Clarke v. Dirks*, 178 Iowa 335, 160 N.W. 31, 36 (Iowa 1916) (same); *Rose v. Ware*, 115 Ky. 420, 74 S.W. 188, 191 (1903) (same); *Monesson v. Alsofrom*, 82 N.J.Super. 587, 198 A.2d 783, 784–85 (1964) (same); *Jones v. Tate*, 68 N.M. 258, 360 P.2d 920, 923 (1961) (same); *Kennedy v. Rinehart*, 281 Or. 391, 574 P.2d 1119, 1121–22 (1978) (same); *Hood v. Cravens*, 31 Tenn.App. 532, 218 S.W.2d 71, 73 (1948) (same); *Scramlin v. Warner*, 69 Wash.2d 6, 416 P.2d 699, 700–02 (1966) (same).

**37.** *Linck*, 559 P.2d at 1053 (citations and internal quotation marks and brackets omitted).

one-third interest in Lot 82 by adverse possession.

d. *Snook may not enforce Shaan–Seet's right of first refusal.*

■ Snook's final argument is that Baumann and Hanson improperly deprived Shaan–Seet of its right of first refusal to repurchase Baumann's and Hanson's interests in Lot 82. Shaan–Seet did retain a right of first refusal to Lot 82 as a restrictive covenant, as set forth in the Port St. Nicholas subdivision declaration. The record does not show that Baumann or Hanson, as required by Article III, section 3.4 of the declaration, offered Lot 82 "to Shaan–Seet on terms identical to the terms the owner has offered to or has received from" the Bowerses.

This argument fails, however. It is true that a section of the declaration provides that "[a]ny owner of property subject to this Declaration shall have the right to enforce the covenants contained in this Declaration." However, Snook lost this right when he lost his share in Lot 82 by adverse possession in March 1996 and was no longer an owner of property subject to the declaration.

## V. CONCLUSION

The Bowerses gained title to Baumann's one-third interest in Lot 82 by Baumann's quitclaim deed to them; to Hanson's one-third interest by specific performance of their agreement with Hanson to convey his interest to them; and to the remaining one third by adverse possession under color of title. Finally, the court properly denied Snook's Rule 60(b) motion to amend the 1995 stipulation. The superior courts' opinions are accordingly AFFIRMED.